Francisco ELIZARRARAS,
Plaintiff–Appellee,

v.

BANK OF EL PASO,
Defendant–Appellant.

No. 78–2428.

United States Court of Appeals,
Fifth Circuit.

Nov. 24, 1980.

Frank H. Hunter, Crawford S. Kerr, Jr., El Paso, Tex., for defendant–appellant.

Mario J. Martinez, Atty., El Paso, Tex., for plaintiff–appellee.

Before COLEMAN, Chief Judge, KRAVITCH and GARZA, Circuit Judges.

KRAVITCH, Circuit Judge.

In a jury trial, appellee Elizarraras was awarded damages of $89,800 due to appellant bank's failure to honor appellee's check. The bank appeals the denial of its motions for a directed verdict and a new trial. The principal issues raised, *inter alia*, are whether a bank can have the right of setoff: (1) against a contingent debt, (2) as a subrogee of another's claim where it has neither paid the party whose rights it claims to be subrogated to nor proved those rights, and (3) without notice where it has

previously indicated to the depositor it will not exercise its right of setoff. We answer these three questions in the negative and affirm on the issue of liability. Because, however, we find insufficient evidence to support the award of damages, we reverse the judgment and remand for a new trial solely on the issue of damages.

### Facts

On April 2, appellee, a citizen and resident of Mexico, issued a check for $12,000 to Joe Rey as partial payment for a tractor. The check was written on appellee's account at the Bank of El Paso, appellant herein. On April 5, Rey, also a depositor at the Bank of El Paso, presented the check for payment. The bank applied $1,115.07 to one note owed to the bank by Rey and $7,539.04 to another note which it marked "paid" and delivered to Rey.[1] The balance, $3,345.89, was deposited by the bank in Rey's account. On the same day, the appellee delivered to the bank a stop payment order, which, on a form provided by appellant, included an agreement by appellee to indemnify appellant for all expenses and costs resulting from appellant's honoring the stop payment order.[2] On either April 5 or April 6,[3] appellant reversed the entries it had made with respect to Rey. On April 6, appellee issued a check for $64,000, which he believed to be the amount he had on deposit in the Bank of El Paso, payable to Financiera Del Norte, S.A., a Mexican financial institution which we will refer to for convenience as a Mexican bank. On April 15, Rey filed suit against appellee and appellant, alleging that appellee wrongfully stopped payment on the check and that appellant wrongfully reversed the entries it

---

1. A bank officer testified that the note was delivered to Rey. The appellants have so maintained in their brief and oral argument. It should be pointed out, however, that in its answers to interrogatories· appellant indicates that it did not deliver a note to Rey.

2. The terms of the indemnification agreement were:
   I agree to hold you harmless for all expenses and costs incurred by you on account of refusing payment of said check and agree not to hold you liable on account of payment contrary to this request if same occurs through inadvertence, accident, or oversight. And it is understood that this order will automatically expire at such time as established by banking regulations, unless renewed in writing.

3. Contradictions in the answers to interrogatories and in the testimony leave the date of reversal unclear.

had made. On April 26, Pedro Jurado, vice president of the Bank of El Paso "acting as a commercial loan and regular installment loan officer," notified appellee that there was a shortage of $756.68 in his account. Appellee immediately deposited the $756.68. Appellee testified that he emphasized to Jurado that it was important that the $64,-000 check not be returned for insufficient funds, since such a return would have serious repercussions in Mexico, including a penalty and loss of credit. According to appellee, Jurado assured him that there would be no problem covering the $64,000 check. On April 30, without giving notice to appellee, appellant returned the $64,000 check to the Mexican bank for insufficient funds and deposited $12,000 from appellee's account into the federal court in which Rey's suit was pending, interpleading Rey and appellee. When Rey's suit was subsequently dismissed for lack of subject matter jurisdiction and Rey sued in state court, the appellant interpled the money into state court.

Appellee subsequently filed suit in federal district court alleging that the wrongful dishonor of the $64,000 had damaged him in Mexico. Appellee prevailed in a jury trial. The jury awarded damages in the amount of $89,800: $75,000 for loss of credit and damage to reputation, $12,800 for the penalty the Mexican bank charged appellee, and $2,000 for interest on the $64,000 still owed to the Mexican bank.

### Issues

The appellant contends that the trial court erred in several respects. First, it maintains that the stop payment order was ineffective, because it was delivered after final payment. *See* Tex.Bus. & Com. Code Ann. tit. 2 §§ 4.403, 4.303(a)(3), 4.301, 4.213 (Vernon) [hereinafter all references to § 4.403, § 4.407, § 4.213, § 4.402, § 4.301, or § 4.303 will be to those sections in this title]. Thus appellee was not entitled to the $12,-000 at issue, which would mean the dishon-or of the $64,000 check would not be wrongful under § 4.402. Second, even if the stop payment order was valid, the indemnification agreement created a contingent debt from appellee to appellant. Appellant contends that contingent debts generally can be set off in Texas; specifically, setoff is permitted when a nonresident depositor attempts to withdraw all his funds from the bank. This right to setoff, appellant urges, justifies the dishonor. Alternatively, the appellant argues that under § 4.407, appellant was subrogated to Rey's claim against the appellee for $12,000 which validated the setoff. The appellant also contends that the use of interpleader was the appropriate action for it to take under the circumstances.

Appellant also questions the proof of damages. It maintains that the trial court's admission of appellee's testimony as to the penalty and interest he paid the Mexican bank was error in that such admission violated the best evidence and hearsay rules. Finally, appellant argues that there was insufficient evidence to allow the jury to award any damages for loss of credit and or reputation.

### Discussion

### The Stop Payment Order

The first contention of the appellant is that the stop payment order was not binding on the bank. Section 4.403 states that to be effective the order must be received "at such a time and in such a manner as to afford the bank a reasonable opportunity to act on it prior to any action by the bank with respect to the item described in Section 4.303." Section 4.303 provides, *inter alia*,[4] that if the item has been paid in cash or settled irrevocably, a stop order subsequently received will be ineffective.[5] The appellant contends that stamping one of

---

4. Appellant does not make contentions involving the other requirements of § 4.303.

5. The stop payment order must actually be received early enough to give the bank a reasonable time to act on it prior to payment in cash or irrevocable settlement. §§ 4.303, 4.403.

Rey's notes "paid" and giving it to him[6] was the equivalent of payment in cash, and, if we construe its brief liberally, that it was an irrevocable settlement.

■ Appellant did not raise this issue at trial.[7] In its motion for an "instructed verdict," the appellant maintained that the appellee did not prove the "fact and amount of loss resulting from the payment of an item contrary to a binding stop order." § 4.403(c). This motion, using Section 4.403(c), deals with damages, not the validity of the stop order; appellant's supporting reasons reflect this interpretation. Appellant does not mention § 4.303 or its requirements elsewhere in his motion for an instructed verdict. Furthermore, although the judge's instructions failed to mention the fact that an irrevocable settlement renders subsequent stop payment orders ineffective, the appellant did not object to this omission nor did he request any instructions on how marking a note "paid" constituted final payment. Finally, the appellant did not advance his § 4.303 theory in his motion for a new trial.[8] This court should not consider a point raised for the first time on appeal unless it is a pure question of law

and a refusal to consider it would result in a miscarriage of justice. *Delancey v. Motichek Towing Service, Inc.*, 427 F.2d 897 (5th Cir.1972); *Patton v. Archer*, 590 F.2d 1319 (5th Cir.1979). The error here, if any, was not so fundamental that it would result in a miscarriage of justice.[9]

### Setoff on a Contingent Debt

The appellant next argues that even if the stop payment order was valid, it was entitled to a setoff of $12,000.[10] This contention is based on the fact that the indemnification agreement created a contingent debt from appellee to appellant: if Rey recovered a judgment for the $12,000 against the appellant, the appellee would have to indemnify the appellant.

Appellee contends that the indemnification agreement is void since there was no consideration flowing to the appellee, citing *Central National Bank v. Martin*, 396 S.W.2d 218 (Tex.Civ.App.1965). We note that appellee did not raise this issue at trial; the question, therefore, is not before us. *See Delancey*; *Patton*. We must assume the agreement to be valid.

6. *See* note 1 *supra*.

7. It is unclear from appellant's brief whether he is objecting to the judge's instructions or to his denial of appellant's motion for a directed verdict. But this question is immaterial since appellant did not raise this issue with regard to either at trial.

8. The appellant's frequent assertions that it was confronted with conflicting demands and therefore interpleader was appropriate does not adequately raise the issue.

9. Even if we assume arguendo that the point was properly raised, the appellant would lose on both the "cash theory" and the "irrevocable settlement theory."

The appellant cites no authority for the proposition that marking the notes "paid" is the equivalent of payment in cash. In fact, the bank obviously did not hold this view at the time of the transaction; it reversed the entire transaction with Rey. Moreover, the phrase "payment in cash" should be strictly construed. The statute reflects the fact that when a payee receives cash, he expects that the cash is irrevocably his. He may spend the cash, relying on this expectation. Neither the expectation of irrevocable ownership nor the readiness to

spend is as pronounced with respect to internal credits; for this reason, a payment is not necessarily final when it is settled by this means. The question is: is marking a note "paid" and giving it to the payor closer to payment in cash or to internal credits in the context of the above discussion? We consider it closer to internal credits. The over-the- counter transfer of cash is unique in creating the aura of irrevocable ownership. Marking a note "paid" is more like crediting a deposit than a transfer of cash.

The appellant does not cite any authority for the proposition that marking notes "paid" constitutes an irrevocable settlement under § 4.303(a)(3), § 4.301, and § 4.213. Again its previous actions indicate a contrary belief. Finally, a mistaken cancellation of a note is arguably ineffective where there has been no actual payment. *Cf. McShan v. Watlington*, 133 S.W. 722 (Tex.Civ.App.1911) (person who paid note to creditor bank could collect from maker despite bank marking note "paid").

10. We need not reach the question of whether a right to setoff would justify interpleading the money.

Appellant contends that a bank may set off a contingent debt, citing *Security State Bank and Trust v. Texas Bank & Trust Co. of Dallas*, 466 S.W.2d 590 (Tex. Civ.App.1971) as its authority. We do not read *Security State Bank* so broadly; thus we reject this contention. First, the language relied on in *Security State Bank* is dicta; the debt in *Security State Bank* had matured. Second, under a long line of Texas cases, a setoff may only be used against a matured debt unless the debtor is insolvent in which case the bank can set off against an unmatured claim. *See, e. g., Baldwin v. Peoples National Bank*, 327 S.W.2d 616 (Tex.Civ.App.1959); *McCollum v. Parkdale State Bank*, 566 S.W.2d 670 (Tex.Civ.App.1978); *Northshore Bank v. Palmer*, 525 S.W.2d 718 (Tex.Civ.App.1975) (dicta); *Bank of El Paso v. Powell*, 550 S.W.2d 383 (Tex.Civ.App.1977) (no setoff springing from an indemnity agreement until actual payment by bank, so depositor entitled to interest on funds withdrawn from his account). Moreover, the rule proposed by appellant would create enormous uncertainty for depositors. Contingent liability is common: co–signing a check or note is one of many ordinary examples. If the bank could set off against these debts, depositors would be forced to avoid contingent liability completely or suffer uncertainty as to their accounts. Finally, such a rule would render the U.C.C. stop payment order rules meaningless wherever there was a valid indemnification agreement.

The appellant, relying on the insolvency rule noted *supra*, urges that appellee's residence in a foreign country and attempted withdrawal of all funds are equivalent to insolvency and thus authorize its right to setoff. This argument also fails. The rule in Texas is that the non–residence of a depositor cannot justify a setoff not otherwise justifiable. *See Stock-yards National Bank v. Presnall*, 194 S.W. 384 (Sup.Ct.Tex.1917). Insolvency has been defined under Texas law to mean a debtor's inability or "failure or refusal to pay his debts in the due course of his business." [11] *McCollum*, at 673. Insolvency, however, does not mean the imminent absence of funds in the bank attempting the setoff. The appellant has made no showing that the appellee was insolvent under Texas law [12] at the time of the setoff.[13]

### Subrogation

Appellant next urges that assuming the stop payment order was valid, appellant was entitled to judgment as a matter of law because under § 4.407 the bank was subrogated to Rey's claim against the appellee, and such debt justified the setoff.

The main problem with this contention is that the appellant had not paid the $12,000 to Rey and thus could not be subrogated to his rights. Under the circumstances of this case, the failure to pay Rey the $12,000 meant appellant could not be subrogated to Rey's rights. *See American Employers' Insurance Co. v. Dallas Joint Stock Land Bank*, 170 S.W.2d 546 (Tex.Civ.App. 1943); *Providence Institution for Savings v. Sims*, 441 S.W.2d 516 (Sup.Ct.Tex.1969) (full payment required unless prior creditor consents to subrogation).

A further flaw in appellant's argument is that even if the appellant were subrogated to Rey's claim, the appellant did

---

**11.** *But see Baldwin v. Peoples National Bank*, 327 S.W.2d 616 (Tex.Civ.App.1959) (implying that the definition of insolvency in this context is the more commonly accepted legal definition: most likely the "inability to pay one's debts as they come due").

**12.** It is unclear under Texas law how many debts must be unpaid and for how long and to what extent in order for a debtor to be considered insolvent for these purposes. We need not decide such questions in this case.

**13.** Even if the appellant had made such a showing, it should not prevail. The law in Texas is that an unmatured debt may be set off in insolvency. *McCollum*; *Baldwin* (dicta). It is true that the rationale behind the unmatured debt rule–to assure banks will collect debts–could cover contingent claims. But whether Texas would so extend the rule is doubtful, for it would create tremendous uncertainty for depositors, especially in conjunction with the Texas rule that a refusal to pay one's debts as they come due is a form of insolvency.

not prove Rey's claim. The appellant cannot simply assert that the appellee owes it money; it must prove the existence of this debt, just as Rey would. *See generally McBroome–Bennett Plumbing, Inc. v. Villa France, Inc.*, 515 S.W.2d 32 (Tex.Civ.App. 1974).

In short, we hold that appellant's claim of subrogation fails because appellant neither acquired Rey's rights nor proved them.

### Notice

The next ground urged by the appellant is that interpleading the $12,000 was proper, and therefore, regardless of its right to setoff, the appellant was entitled to a directed verdict. We need not reach this issue,[14] for even if the appellant were correct, it would be liable on another ground.[15] *See Stegmaier v. Trammell*, 597 F.2d 1027 (5th Cir.1979) (appellate court must affirm if result is correct). *See also Securities & Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1942) (limiting the rule to cases where appellate court need not make findings of fact).

Here, the appellant implicitly assured the appellee that his check for $64,000 would be honored. Appellant did so by notifying the appellee that he was $756.68 short (an undisputed fact); such a statement carries the clear implication that appellee is *only* $756.68 short.[16]

Neither party directs us to any Texas cases on whether notice to a depositor is required prior to a bank's interpleading funds at least arguably in the depositor's account. However, our research has revealed that the law in Texas and elsewhere is that notice is not required prior to setoff, an analogous question. *Baldwin v. Peoples National Bank*, 327 S.W.2d 616, 620–22 (Tex.Civ.App.1959). Even if this rule were applicable to interpleader (a question we do not decide), there is no indication, however, that Texas or other jurisdictions would apply the rule where the bank has indicated that a check would be honored and the check could only be honored if there were no setoff. In the absence of such authority, we decline to extend the no notice rule to such a situation. A proper concern for depositor expectations requires us to engraft such a limitation on the no notice rule.[17] Furthermore, this limitation should apply to interpleader as well as setoff when the funds being interpled are on deposit at a bank.

**14.** Among other reasons, we decline to reach this question because it was inadequately briefed.

**15.** This basis for liability would apply even if the stop payment order were invalid or the bank prevailed on either its contingent debt or subrogation arguments.

**16.** The fact that appellee was initially $756.68 short and that appellant notified him of this fact is uncontested: both Jurado and appellee so testified without being controverted. Furthermore, appellant's brief, the testimony of another of appellant's officers, and documentary evidence admitted without objection confirm the fact that the appellee was initially short and covered the shortage. That the latter three did not also refer to the notification of appellee does not, in the context of the whole record, undermine our belief that such notification was uncontested.

Appellee also testified that in mid–April he told Jurado of the seriousness of having a check bounce in Mexico and that Jurado gave him assurances that his check would be honored. Although this testimony was uncontroverted, it was neither admitted by the appellant (as the $756.68 shortage) nor necessarily found by the jury in rendering its verdict. Moreover, it is not entirely clear Jurado had express or implied authority to bind the bank on this matter.

**17.** Although we express no opinion on the appropriateness of the general no notice rule in the setoff context, it has a certain logic in terms of depositor expectations. A depositor whose debt to a bank has matured would probably not be surprised to learn the bank had used his funds on deposit to satisfy the debt. If the depositor is insolvent, it is at least arguable that he expects that the bank, uncertain as to his future financial status, may want and be entitled to payment before total insolvency. Even in the interpleader context, a depositor might expect a bank to freeze (or interplead) money which is being claimed by another party (though, as noted, we do not decide whether normally notice is necessary prior to interpleader). This same logic is inapplicable to a depositor who has been told that his check will be honored, when that, in effect, is an assurance that there will be no setoff or interpleader.

Analogous case law supports this result. In *Central National Bank v. Martin*, 396 S.W.2d 218 (Tex.Civ.App.1965), the bank mistakenly issued a cashier's check to the payee of a check which had been stopped three days before. The bank sued for the return of the money. The court held that the bank had a right to the money: "money paid under a mistake of fact caused by carelessness, negligence or forgetfulness may be recovered." The court, however, remanded the case to provide the payee with an opportunity to prove that if he had to return the money he would suffer damages as a result of the bank's negligence in paying it to him.

*Central National Bank* is not directly on point, but it is analogous. In *Central National Bank*, the bank had a right to a certain sum of money. By its own act, it led another to believe that the money was irrevocably his. In such a situation, the bank was entitled to recover the money, subject to any damages suffered by the payee in relying on the bank's negligent act.[18] In our case, the bank would arguably have a right to interplead the $12,000. However, by in effect indicating to the appellee that it would not interplead the money, it led him to believe the money was irrevocably his. Thus, when the bank exercised its right, it became liable for all damage suffered by the appellee in reliance on the bank's assurances (which is what he recovered at trial).[19]

▋ For the bank to be liable under the *Central National Bank* principle, the bank must have been negligent in leading appellee to believe the $12,000 was clearly his. The appellant might contend that the indication that the $64,000 check would be honored was not negligent, since at the point the indication was given no plans had been made to interplead the $12,000. Even if this were so, which seems unlikely (the money was interpled four days later), the failure to give notice of the decision to interplead the money was a negligent omission since there was a duty to act created by the earlier indication that the $64,000 check would be honored.

In summary, we hold that (1) appellant did not properly raise the validity of the stop payment order, (2) appellant has no right of setoff against a contingent debt, (3) appellant neither acquired nor proved Rey's rights, and (4) under the circumstances, appellant's negligent failure to notify appellee of its decision to interplead the $12,000 made it liable for damages suffered by appellee due to appellant's dishonor of the $64,000 check. We thus affirm on the issue of liability.

*Proof of Damages*

Appellant contends that essential evidence to support the award of $12,800 penalty and $2,000 interest to the Mexican bank was wrongfully admitted and that evidence to sustain the $75,000 award for loss of credit and damage to reputation was insufficient.

▋ At trial appellant objected to the following statement made by appellee: "I paid the $64,000; then $12,800 and twenty-three and something else."[20] Under Fed.R.Evid. 602, a "witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." The Advisory Committee on the Federal Rules, in its notes on Rule 602, points out that "[t]his rule would prevent [a witness] from testifying to the subject matter of [a] hearsay statement, as he has no personal knowl-

---

**18.** This same basis of liability—a negligent act causing another to believe a certain sum of money was his—was invoked in *National Indemnity Co. v. Spring Branch State Bank*, 348 S.W.2d 528 (Sup.Ct.Tex.1961).

**19.** In *Central National Bank* the payee's potential damages were limited to the money transferred to the payee, because if it appeared the payee would suffer more damages, the bank would not demand payment. In the instant case, the appellant already exercised its "right" and denied appellee the money, so that there is no such limit to damages.

**20.** The words quoted by the appellant in his brief on page 19 do not appear in the record; this statement appears to be what the appellant was referring to.

edge of it." The problem in the instant case is that the appellee did not carry the burden Rule 602 puts on him of showing personal knowledge of the matter testified to (although appellant objected on hearsay grounds, not personal knowledge, we will not draw such a fine line). In context, it is clear that as to the penalty and interest appellee was not testifying to any act of payment he committed, but rather to the fact his account was charged $12,800 and $2,000; thus, this is not an instance where one can infer personal knowledge from the testimony itself.[21] The only basis appellee appeared to have for his testimony concerning the payment of the penalty and interest was the Mexican bank officers' oral assertions[22] and the Mexican bank notice appellant received; yet this evidence had been excluded as inadmissible hearsay.[23] Neither the conversation nor notice is in the record on appeal. Therefore, we do not rule on the admissibility of this evidence.[24]

▮ Nor can we agree that admission of the appellee's testimony was harmless error.[25] The testimony was introduced to show that the appellee paid the Mexican bank a penalty of $12,800 and interest of $2,000 due to the return of the check.[26] The only other evidence introduced with regard to these facts was expert testimony on whether Mexican law would have required a 20% penalty on the return of the check and authorized the interest charge, and appellee's testimony that the bank asserted that he owed it interest due to the return of the check.[27] Although to reach its

---

21. An example would be "I saw X in the room."

22. On voir dire, appellee began to testify that the Mexican bank officials told him about the $12,800 penalty and the $2,000 interest (in context this seemed to be what he was about to say), but an objection to this as hearsay was sustained.

23. If his testimony had been based on admissible hearsay, this would presumably satisfy Rule 602, though we do not decide the question.

24. Even if *Jaffke v. Dunham*, 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed.2d 314 (1956) (appellate court can review admissibility of evidence which would support district court's result even where appellee did not cross–appeal) would apply to a case where the appellate court would have to request documents to supplement the record, appellee would not be helped: both the conversations and notice would be inadmissible to show he paid the $12,800 and $2,000. The Mexican bank officers' oral assertions that his account had been reduced by $12,800 and $2,000 were clearly hearsay (moreover, there was no proffer, so they would be impossible to review). The notice was also hearsay. In the notice, the bank, an out–of–court declarant, asserted that the bank reduced the appellee's account by $12,800 and $2,000. Since it was introduced to prove the truth of the matter asserted, the reduction of appellee's account, the notice was hearsay. The only hearsay exceptions which might be applicable would be § 803(6), records of regularly conducted activity, and § 803(24), the general exception. Section 803(6) would not apply because no "qualified witness" testified that such notices were "kept in the course of [its] regularly conducted business" or that "it was the regular practice of [the bank] to make the [notice]." A qualified witness must be one with knowledge of the declarant's business; appellee is not shown to have such knowledge. Section 803(24) would not be applicable because no showing was made that notice was given to appellant nor that reasonable efforts could not have resulted in having the Mexican bank officers testify either with respect to the notices or directly about the reduction of appellee's account.

25. If the appellee had presented us with the conversations and notice, they would probably have been admissible (the latter if authenticated) to show that the Mexican bank asserted that the appellee owed it money, even if inadmissible to show appellee paid the money. Furthermore, if the notice and conversations had been admitted to show the Mexican bank's assertions of the $12,800 penalty, the error of admitting the testimony to show payment of the $12,800 would have been closer to being harmless, since there was also evidence that Mexican law imposed this penalty. Even then, however, as in the case of the $2,000 interest discussed in the text, we do not believe the error would have been harmless.

26. Although the appellee does not testify that he paid these sums because of the return of the check, there is sufficient other evidence to establish this causal relationship.

27. Appellee's testimony on this subject (to which there was no objection) is unclear, but such meaning can be derived from the record. (R. 114). However, there is no indication that the bank reduced appellee's account by the amount of the interest. We will not assume a setoff.

verdict the jury had to find that under Mexican law the Mexican bank was entitled to a penalty of $12,800 and interest of $2,000 from the appellee, and that the Mexican bank asserted there was an interest charge, the jury might very well have not found these facts alone without proof of payment sufficient to establish the disputed damages. *See Liner v. J. B. Talley & Co., Inc.*, 618 F.2d 327 (5th Cir. 1980) (articulating harmless error standard). We therefore reverse the judgment insofar as it awards the appellee $12,800 and $2,000 and remand for a new trial on those issues.[28]

Appellant also questions the sufficiency of evidence to sustain the award of $75,000 for loss of credit and or reputation. Appellant made a timely objection to that part of the jury charge which instructed the jury to consider plaintiff's damages for loss of credit and or reputation. Appellant contends that the evidence of the amount of the damages due to loss of credit was so lacking that any award would be the product of pure speculation. *Household Goods Carriers' Bureau v. Terrell*, 417 F.2d 47 (5th Cir. 1969). It points out that no evidence was introduced as to the amount of the loss

appellee suffered from losing his line of credit. Nor was enough evidence introduced from which the jury could reasonably infer the amount of damage suffered by his businesses, such as the amount of credit used [29] or needed or the size and prospects of appellee's businesses. Without such information, appellant argues, no reasonable estimate of appellee's damages could have been made.

Appellant assumes that the normal rules of proof apply with respect to damages. However, our research has revealed that this may not be so and that a special rule for wrongful dishonor of checks should apply.[30]

■ Prior to the U.C.C., the common law rule, the so-called trader rule, was that a businessman need not prove actual damages to recover substantial damages for the wrongful dishonor of a check. *See, e. g., First National Bank v. N. R. McFall & Co.*, 222 S.W. 40 (Sup.Ct. Ark. 1920). *See generally* Annot. 126 A.L.R. 206, 220–25 (1940). Although the question is not free from doubt, it appears that the rule prevailed in Texas.[31] *See Stone Fort National Bank v.*

---

**28.** The appellant's best evidence objection to the admission of the same testimony may also have been a proper one, but we need not reach that question in light of the hearsay discussion.

**29.** The statement "I utilized [my credit]" does not necessarily mean he used all of it. Furthermore, it is not clear that the $64,000 borrowed from the Mexican bank was used for business purposes; the only reference to such use was in an exchange between appellee's counsel and the court.

**30.** Although we are actually reviewing damages for the negligent failure to notify the appellee of the interpleader, the rules regarding wrongful dishonor of a check should be applied, since our situation is so closely analogous.

**31.** Texas law is complicated by the fact that there is a split as to whether loss of credit, damage to reputation, and other such losses of future profits are elements of actual or exemplary damages. *Compare Southwest Bank & Trust Co. v. Executive Sportsmen Association*, 477 S.W.2d 920 (Tex.Civ.App.1972) (actual if foreseeable) *with Sterling Projects, Inc. v. Fields*, 530 S.W.2d 602 (Tex.Civ.App.1975) (exemplary). Although one could argue that *Ster-*

*ling* should not be applied to wrongful dishonors, there is no support in reason for such a limitation of *Sterling*. Furthermore, the wrongful dishonor cases are similarly split, although they do not acknowledge the conflict. *Compare Northshore Bank v. Palmer*, 525 S.W.2d 718 (Tex.Civ.App.1975) (the court implicitly suggests it follows the *Sterling* rule by noting that there was no objection to the trial court's characterization of loss of credit and damage to reputation as consequential damages) and *State National Bank v. Rogers*, 89 S.W.2d 825 (Tex.Civ.App.1935), *with Stone Fort, First National Bank v. Hubbs*, 566 S.W.2d 375 (Tex.Civ.App.1978), *Farmers & Merchants State Bank of Krum v. Ferguson*, 605 S.W.2d 320 (Tex.Civ.App.1980), and *Gustason v. Northeast National Bank*, 486 S.W.2d 596 (Tex.Civ.App.1972) (dicta saying that loss of credit and damage to reputation are recoverable under § 4.402). If *Sterling* is correct and it applies in the wrongful dishonor area, the trader rule should not exist in Texas, since the trader rule *compensates* the plaintiff for loss of credit and reputation. *See McFall v. First National Bank*, 211 S.W. 919 (Sup.Ct. Ark. 1919).

We believe that *Southwest Bank* is well reasoned and would be followed in Texas rather than *Sterling*; thus, there is no barrier to applying the trader rule.

*Forbess*, 41 S.W.2d 695, 697 (Tex.Civ.App. 1931). *But cf. State National Bank v. Rogers*, 89 S.W.2d 825 (Tex.Civ.App.1935) (the court does not mention the trader rule).[32]

■■■ Where the U.C.C. does not address an issue, one should refer to the common law for guidance. Thus, the first question is whether the U.C.C. abolished the trader rule. In the absence of any meaningful guidance on this from the Texas courts,[33] we hold on the basis of the legislative history and the language of the statute that the U.C.C. only narrowed the trader rule. The U.C.C., § 4.402, reads:

> A payor·bank is liable to its customer for damages proximately caused by the wrongful dishonor of an item. When the dishonor occurs *through mistake* liability is limited to actual damages proved. If so proximately caused and proved damages may include damages for an arrest or prosecution of the customer or other consequential damages. Whether any consequential damages are proximately caused by the wrongful dishonor is a question of fact to be determined in each case. (emphasis added)

The key words are in the second sentence: "through mistake." Where the dishonor is not "through mistake," the sentence does not apply and thus the common law applies.

It can be argued that the third sentence, by negative inference, and the fourth sentence indicate that damages must always be proved for one to·recover consequential damages. We decline to adopt such an interpretation. The third sentence should be read as limited in scope to instances where the wrongful dishonor was by mistake. If the drafters had meant the "through mistake" limitation not to apply to the third sentence and its requirement of proof of damages, they would have said so expressly. Furthermore, the legislative history supports our interpretation. *See* White & Summers, Uniform Commercial Code 671 n.73 (2d ed. 1980). As for the fourth sentence, Comment 5 to § 4.402 indicates that it was meant to liberalize the proximate cause rules *for* plaintiffs, not further erode the trader rule. Moreover, the fourth sentence is actually consistent with the trader rule, since under the common law the defendant could rebut the trader rule "presumption" of substantial damages and show the plaintiff suffered no damage. *See generally* White & Summers, at 673; but *cf. First National Bank v. McFall*, 222 S.W.2d 40 (Sup.Ct. Ark. 1920) (defendant may, by such proof, reduce but not eliminate substantial damages).

■■■ The next question we must decide is what the word "mistake" means in the second sentence, for whether the dishonor was a mistake determines which rule applies. "Mistake" here has several possible meanings. One is anything but a knowingly wrongful·dishonor. This is overly broad; even if the mistake exception was included primarily to allow courts to award punitive damages,[34] "mistake" should not be limited

---

Even if *Sterling* applied, we could not sustain the $75,000 award because there were no instructions with regard to exemplary damages. We would have to evaluate the $75,000 award as if it were an award for actual damages. *Northshore*. We would use the normal damages rules, because *Sterling* cannot co–exist with the trader rule. Under the normal damages rules, the proof was insufficient, as pointed out by appellant.

**32.** It is possible the failure to discuss the trader rule was because a farmer is not a trader or that the trader rule's presumption of substantial damages was rebutted.

**33.** Recent Texas cases do not meaningfully address the issue. *See, e. g., Northshore Bank v. Palmer*, 525 S.W.2d 718 (Tex.Civ.App.1975) (no mention of the trader rule); *Gustason v. North-*

*east National Bank*, 486 S.W.2d 596 (Tex.Civ. App.1972) (although certain dicta could be read as implying that the U.C.C. abolished the trader rule completely, this dicta should not be relied on; *see* note 34 *infra*); *Farmers & Merchants State Bank*. Another case, *First National Bank v. Hubbs*, 566 S.W.2d 375 (Tex.Civ.App.1978), has dicta implying that damages due to loss of credit must be proved, but it relies for this on *Northshore*, which does not stand for this proposition.

**34.** On the question of whether exemplary damages are recoverable for wrongful dishonor, we do not believe the dicta in *Gustason* asserting that they are not would be followed by the Texas Supreme Court. Such a holding reads

to all but such deliberate dishonors.[35] Another is that suggested in White & Summers, at 669–74, which is essentially a distinction between mistakes of law and mistakes of fact. We are not persuaded that this distinction is the proper one. The most sensible meaning is good faith as defined in Article 2: "honesty in fact and the observance of reasonable commercial standards of fair–dealing in the trade." *Cf. Farmers & Merchants State Bank of Krum v. Ferguson*, 605 S.W.2d 320 (Tex.Civ.App.1980) (at least where bank is reckless, action under § 4.402 sounds in tort for purposes of recovery for mental anguish as consequential damages); *Northshore*, at 720 (implies good faith may be the standard). We hold that after implicitly assuring appellee the check would be honored, appellant's failure to notify the appellee of the interpleading of the money prior to dishonoring appellee's check is conclusive as to appellant's bad faith; the wrongful dishonor, therefore, was not a "mistake" as defined in § 4.402.

Since the wrongful dishonor was not a mistake, the common law applies. The next issue is whether under the trader rule the evidence was sufficient.

 Even under the trader rule some evidence should be required. The rationale of the rule is that it is too difficult to prove that any specific loss of income was caused by the damage to one's general reputation or to a loss of credit. *See First National Bank v. McFall*, 222 S.W. 40 (Sup.Ct. Ark. 1920). This rationale satisfactorily explains why a plaintiff need not show that the wrongful dishonor proximately caused actual damage, but it does not explain why a plaintiff need not show his business' size, past income, prospects, and need for and past use of credit to recover for damages due to loss of credit. Requiring some such evidence reduces the jury's area for specu-

lation, while still achieving the purposes of the trader rule. Such a form of the rule was implied in *McFall v. First National Bank*, 211 S.W. 919, 922 (Sup.Ct. Ark. 1919). Without such a rule, a business could recover damages disproportionate to any possible injury. We believe that this form of the trader rule should be applied. Under it appellee failed to carry his burden of proof.

For the above reasons, we also reverse the award of $75,000 for loss of credit and or reputation and remand for a new trial on this issue.[36]

AFFIRMED IN PART, REVERSED IN PART. REMANDED FOR A NEW TRIAL ON DAMAGES.

---

"through mistake" out of § 4.402. *Northshore* and *Farmers & Merchants State Bank* similarly dismiss this dicta in *Gustason*.

**35.** Retaining the trader rule for dishonors which are not the product of a mistake is probably explicable by a punitive motive, even though it is a compensatory rule.

**36.** We need not and thus do not reach the question of whether the evidence of damage to reputation was sufficient to submit the issue to the jury. Since we cannot be sure how much of the $75,000 the jury awarded for loss of credit, the entire $75,000 award must be reversed.