## UNITED STATES

v.

**Ibrahim Y. DABABNEH, 570 53 2634, Lance Corporal (E–3), U.S. Marine Corps.**

**NMCM 88 0470.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 8 June 1987.

Decided 5 May 1989.

Maj J.L. Powers, USMC, Appellate Defense Counsel.

LT. Scott A. Hagen, JAGC, USNR, Appellate Government Counsel.

Before RILEY, Senior Judge, and MIELCZARSKI and ALBERTSON, JJ.

ALBERTSON, Judge:

In accordance with his plea, the appellant was convicted by a general court-martial composed of officer and enlisted members of an unauthorized absence of approximately 2 months duration, in violation of Article 86 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 886. Contrary to his pleas, the appellant was also convicted of eight specifications of making and uttering bad checks of a total value of $3150.00, in violation of Article 123a, UCMJ, 10 U.S.C. § 923a. A ninth specification involving a $50.00 check was dismissed before trial by the military judge upon defense motion. The appellant was sentenced to forfeitures of $400.00 pay per month for 24 months, reduction in rate to paygrade E–1, and confinement for 24 months. The convening authority approved the sentence, but suspended all confinement in excess of 14 months for 1 year from the date of his action.

I

The appellant contends that the bad checks in question, as well as a series of bank statements of his credit union account, were admitted without proper foundation. To adequately discuss the foundational requirements of the contested exhib-

its in this case it will first be necessary to summarize relevant testimony touching these exhibits.

### A.

The United States first called Mr. Tomashiro, who testified on direct examination that he was presently the Assistant District Manager for the Okinawa Region of the National Bank of Fort Sam Houston, a post he had held from "the takeover." Prior to the takeover, he had been for 13 years a bank manager on Okinawa for the American Express International Banking Corporation (AEB). In 1986, at the time the eight alleged bad checks were written, he was the manager of the AEB at Camp Hansen (the bank and place where six of the checks were cashed). As manager, he was responsible for the efficient operational and administrative management of the bank. He was familiar with the check cashing procedures used by his bank and described them, including customer identification procedures. He was familiar with the markings his employees placed upon checks. Mr. Tomashiro then was given and identified the six checks written at his bank, each marking his tellers had placed upon them, his initials on one check and the personal information his bank required. At this point the trial counsel offered the checks into evidence. The defense objected on the grounds that the checks contained a hearsay statement, *i.e.*, the words "insufficient funds" stamped on the face of each check. The trial judge "reserved" his ruling and had the witness clarify two points including the fact that AEB held the checks until they were surrendered to the prosecution.

The trial counsel then resumed his examination. Mr. Tomashiro testified that the "insufficient funds" stamp on each check signified that the appellant's credit union, the Navy Federal Credit Union (NFCU), was not going to send AEB in Okinawa any remittance because the appellant's account did not have sufficient funds. In fact, NFCU never paid AEB. The trial counsel then again offered the checks. The defense counsel again objected on hearsay grounds.

The defense voir dired. Mr. Tomashiro's voir dire testimony revealed that he had never worked for the NFCU nor any other American bank off of Okinawa. He further stated that after a check was cashed by an AEB teller, the teller submitted the check to a computer operator who entered the dollar amount of the check into AEB's computer. A messenger then would take the check to the main district operations center at Camp Foster where it would be sorted according to its type. Then the checks would be sent on a cash letter form to a check clearing bank in the United States asking for remittance—this was the point when AEB would surrender actual custody of the check. The "insufficient funds" stamp would not be on the check at the time of surrender, and no one at AEB places the stamp on the check. In fact, he did not know who at NFCU placed the stamp on the check or where the stamp was placed or under what guidelines the stamp was placed. Following this testimony, the trial judge sustained the hearsay objection.

The United States next called Mr. Sakihama to the stand. He had been a store manager in general for 30 years, and, for the last 5, the manager of the Camp Hansen Okinawa Exchange (OWAX). As manager, he controlled all of the OWAX merchandise and financial records, including those of checks it had cashed for its customers. He was familiar with the check cashing procedures at the exchange and explained them. He explained what markings were placed on the checks. He was then given the remaining two checks in issue and identified them as checks made out to OWAX and he identified the tellers who cashed the checks from their initials. The markings, including personal identifying information, on the checks are required as a regular part of his business. Mr. Sakihama stated that when these checks were uttered, OWAX gave the appellant the face amount for each check. At this point, the trial counsel offered these two checks, the defense counsel objected on the grounds of hearsay and the trial judge

sustained the objection because he "could not admit the entire document."

Mrs. Morse, an accounting technician who tracks dishonored checks for OWAX, testified next. She was given the same two dishonored checks that Mr. Sakihama testified about and also identified them as dishonored checks written to OWAX. She testified that OWAX had finally received payment on the two checks by having the appellant's pay involuntarily "checked."

Finally, Mr. Thomas testified first at an Article 39(a), UCMJ, session, about all eight checks as well as the appellant's bank statements. Mr. Thomas was and had been the supervisor of Okinawa Operations, NFCU, for 3 years. He was shown all of the checks and testified substantially as follows. Each check was stamped "insufficient funds" on its face, which indicates that NFCU had refused the checks for lack of sufficient funds in the member's account at the time the checks were presented. The stamp would have been placed by an NFCU employee at the headquarters office near Washington, DC. The stamper would have done so based upon output from a computer program. The stamper would have had authority to so stamp, and would have done so when the check was received and it was determined that there were insufficient funds. The NFCU has a business duty to stamp the checks as part of its normal business practice and does in fact do so. At this point, the trial counsel again offered the checks.

The defense voir dired. Mr. Thomas did not know from personal knowledge the exact individuals who stamped the checks, however, he knew it was done within the auditing department, which he knew from personal knowledge based upon a visit to the NFCU headquarters. He did not actually see stamps being placed on the checks during his visit, nor was he familiar with the guidelines that the stampers follow, nor the guidance they are given. He was familiar with the operations of the computer only as a layman who communicates with it. He was not familiar with the computer's program, nor any of the controls to assure its accuracy. And except for the

one visit, the extent of his knowledge of the stamps and how they "come to be" placed on the checks was based upon the reports of others. At this point, the defense counsel objected on the grounds of improper foundation.

The trial counsel then re-examined. Mr. Thomas was familiar with the stamping procedures based on two visits to the headquarters office as well as his continuous weekly oral and written communications with it, and by "working with these types of problems." The trial judge then examined. For the first 6 months of his 3 years, Mr. Thomas dealt mainly with returned checks so that he could become very familiar with this type of situation. As checks returned for insufficient funds, there are no irregularities on the face of the checks in issue. Based upon hundreds and hundreds of personal handlings of returned checks he had never personally known of, nor had he ever heard of, an error in stamping checks for "insufficient funds" when funds were actually in the account. He had heard of errors where deposited funds had not found their way into the account, or where funds had been improperly taken out. His unit accessed the computer in Washington 700–800 times per day, and very, very seldom had it generated erroneous data. In November and December, 1986, and January, 1987, the computer was 100% accurate.

The defense continued its voir dire. Part of Mr. Thomas' responsibility as a user of the system was to continuously monitor the computer's output to assure correct operation, but another section back in Washington was responsible for the programs and their correct operation, keeping the system in proper working order, checking its accuracy and tracking particular errors. In general, unless an error affected one of his account holders, Mr. Thomas was unaware of it. The 100% figure was his assumption. At this point the trial judge overruled the defense objection and admitted all checks under Mil.R.Evid. 803(6).

The trial counsel then had Mr. Thomas lay a similar foundation for the appellant's statements of account, including the fact

that the same computer that determined the sufficiency of funds in the account also generated the information contained in the statements. Accompanying copies of the statements was a sworn affidavit made by a custodian of the statements that the copies were "true" and that "[s]aid records were prepared by the custodian or the personnel of NAVY FEDERAL CREDIT UNION in the ordinary course of business and were prepared from records which were themselves prepared at or near the time of the act, condition or event." The credit union kept microfiche copies of the statements it had sent to its shareholders. The defense elicited on voir dire that Mr. Thomas did not personally know about the security procedures of the computer. The proffered exhibit was copies from microfiche records maintained at company headquarters of bank statements which were sent to the appellant. The defense then objected on grounds of hearsay and this objection was overruled. Other Mil.R.Evid. 401 and 403 objections were properly decided and are not the subject of appeal. Defense conceded that the affidavit's purpose was to authenticate the exhibit and did not object on authenticity grounds.

### B.

▬ The trial judge determines the admissibility of evidence.[1] Mil.R.Evid. 104(a).[2] In so doing, he "is not bound by the rules of evidence except those with respect to privileges." *Id.* Thus, for example, instead of receiving live evidence, he may consider documentary hearsay, including affidavits. "The Rule on its face allows the trial judge to consider ANY evidence whatsoever, bound only by the rules of privilege." *Bourjaily v. United States*, 483 U.S. 171, 178, 107 S.Ct. 2775, 2780, 97

L.Ed.2d 144, 154 (1987) (emphasis added). *See also United States v. Farris*, 21 M.J. 702, 705 n. 6 (A.C.M.R.1985); Fed.R.Evid. 104 advisory committee's note. In making his rulings, the standard of proof to be used by the trial judge is the preponderance of the evidence standard.[3] *Bourjaily*, 483 U.S. at 175, 107 S.Ct. at 2778–9, 97 L.Ed.2d at 152–3; *Farris*, 21 M.J. at 705 n. 6. For documentary evidence, the first element of the foundation that must be laid is the authenticity of the document: Is it what it purports to be? Mil.R.Evid. 901(a). After establishing by a preponderance of the evidence that the document is what it purports to be, the proponent of the document must then establish that it is not hearsay, Mil.R.Evid. 801, or that it falls within an exception to the rule against hearsay, Mil.R.Evid. 803 and 804. Any hearsay statements contained within or on the document must be evaluated independently. Mil.R.Evid. 805. Of course, the evidence must be relevant, Mil.R.Evid. 402, although it may be excluded if the opponent shows that its probative value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, misleading of the members, undue delay, wastage of time, or needless cumulativeness. Mil.R.Evid. 403. Finally, other rules of evidence may also apply to exclude or restrict the use of the proffered evidence.

### C.

▬ In this case, Tomashiro with regard to the AEB checks, and Sakihama and Morse with regard to the OWAX checks, established that each check was what it purported to be—a check uttered by the appellant, cashed by their respective institutions and returned to the institution on account of insufficient funds in the appel-

---

1. In so doing, he also rules upon preliminary questions of fact necessary to rule on admissibility by determining whether or not the finders of fact can reasonably decide that the required factual condition exists. *See Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144, 152 (1987). *See also United States v. Pollard*, 27 M.J. 376, 377 (C.M.A.1989).

2. Manual for Courts–Martial, United States, 1984 (MCM).

3. "The inquiry made by a court concerned with these matters is not whether the proponent of evidence wins or loses his case on the merits, but whether the evidentiary Rules have been satisfied. Thus, the evidentiary standard is unrelated to the burden of proof on the substantive issues, be it a criminal case or a civil case." *Bourjaily*, 483 U.S. at 175, 107 S.Ct. at 2779, 97 L.Ed.2d at 152 (citations omitted).

lant's account. The trial judge properly found that the checks were authenticated. Even without the live testimony, the "insufficient funds" stamps had been authenticated by virtue of Mil.R.Evid. 902(9), the judge having taken judicial notice of Section 3–510 of the Uniform Commercial Code (U.C.C.):[4]

> 3–510. Evidence of Dishonor and Notice of Dishonor.
>
> The following are admissible as evidence and create a presumption of dishonor and of any notice of dishonor therein shown:
>
> . . . .
>
> (b) the purported stamp or writing of the drawee, payor bank or presenting bank on the instrument or accompanying it stating that acceptance or payment has been refused for reasons consistent with dishonor.

*United States v. Dean,* 13 M.J. 676, 679 (A.F.C.M.R.1982).[5] *See also United States v. Baugh,* 33 C.M.R. 913, 921 (ABR 1963).

### D.

■ With regards to the hearsay considerations, as for the checks themselves, together with the tellers' markings and routing stamps, they are commercial events which create legal rights and obligations, and therefore no exception to hearsay need be found.[6] The crucial issue, and the one the trial judge properly focused on at trial, is the status of the stamp of "insufficient funds."

■ Such a stamp is both a verbal act and a hearsay statement. Thus the Government can elect what use it wishes to make of the stamp. If it wishes to offer it for the truth of the matter asserted, that is, to show that in fact the appellant had insufficient funds in his account to cover the check, then the stamp must fall within a recognized exception to the rule barring hearsay to be admitted. In this case, the United States did rely on the truth of the stamps and attempted to enter them through Mil.R.Evid. 803(6), colloquially known as the "business records exception," which states, in pertinent part:

> Rule 803. Hearsay exceptions; availability of declarant immaterial
>
> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activi-

---

4. U.C.C. § 3–307 is also relevant, regarding the authentication of the instrument itself. Its pertinent provisions read:

> 3–307. Burden of Establishing Signatures, Defenses and Due Course.
> (1) Unless specifically denied in the pleadings each signature on an instrument is admitted. When the effectiveness of a signature is put in issue
> (a) the burden of establishing it is on the party claiming under the signature; but
> (b) the signature is presumed to be genuine or authorized....

Thus, while in a criminal case the effectiveness of the signature on a negotiable instrument is always automatically in issue, the proponent still retains the benefit of the presumption of genuineness. "Actually, no testimony was required to establish the genuineness of the signatures on the notes. In effect U.C.C. § 3–307 creates a presumption that commercial paper offered in evidence is authentic and Rule 902 dispenses with a requirement of extrinsic evidence for admissibility." *United States v. Carri-*

*ger,* 592 F.2d 312, 316 (6th Cir.1979). This principle was explicitly recognized by this Court in *United States v. Matthews,* 15 M.J. 622 (1982), *pet. denied,* 16 M.J. 146 (C.M.A.1983).

5. In spite of the sweeping language of this section, and the apparent confusion of this Court in *Matthews,* 15 M.J. at 627–628, we note that it does not eliminate the need for a hearsay exception, because Mil.R.Evid. 902(9) pertains only to authentication issues. *See Dean,* 13 M.J. at 679; *Richter and Phillips Jewelers and Distrib. v. Dolly Toy Co.,* 31 B.R. 512, 514 n. 1 (Bankr.S.D.Ohio 1983). This confusion is due to the loose use of the word "foundation," which encompasses all requirements of admissibility of evidence. Counsel should state precisely which element of foundation they are referring to in objections or argument.

6. A verbal act is not hearsay, 4 Weinstein's Evidence (MB) ¶ 801(c)[01], and is defined as an "utterance [which] is an operative fact which gives rise to legal consequences." *Id.* at 801–71.

ty, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

██ Although the government did not lead Mr. Thomas through an incantation of magic words, it is possible and fair to find, directly from his testimony or from fair inferences drawn from his testimony, that Thomas' testimony established the hearsay exception. Each stamp is a report. Each reports a condition, to wit: that the amount of funds in the appellant's checking account is less than the amount of funds required to honor the check. Each stamp was made by someone with knowledge of the condition. Each stamp was made at the time the condition existed or near the time the condition existed. It was the regular course of NFCU's business activity to keep the balances of its customers' accounts and to compare those balances against checks presented for payment. And, finally, it was the regular course of NFCU's business activity to stamp a presented check with the stamp "insufficient funds" if the amount on the check exceeded the amount in the customer's account.

Thomas' testimony, however, would be ineffective if he were not "the custodian or other qualified witness." It is clear that Thomas was not the custodian of the checks, therefore, the ultimate issue in this case is whether or not Thomas was an "other qualified witness." Several tests, any of which may be helpful in a particular case, exist for determining whether or not a witness is an "other qualified witness."

██ In *Elizarraras v. Bank of El Paso*, 631 F.2d 366, 374 n. 24 (5th Cir.1980), the court said that "[a] qualified witness must be one with knowledge of the declarant's business." While Thomas obviously has knowledge of NFCU's business, this statement is somewhat suspect as a comprehensive description in that the court was speaking of a minimum requirement

which was not met in that case. If, however, the witness is shown not only to have knowledge of the declarant's business, but also some knowledge of the particular activity of the business which generates the report, then a helpful test for "other qualified witness" is generated. In this case, although Thomas was unfamiliar with the specific guidelines the stampers used in stamping checks, the precise personnel who stamped the checks, or the computer program which tracked members' accounts, Thomas did demonstrate enough knowledge of the relevant particular activity of NFCU, *i.e.*, the processing of its members' checks for payment, that he could provide the trial judge with a rational basis for concluding by a preponderance of the evidence that the elements to the exception were present. Most significantly, in light of the purpose for the rule barring hearsay, Thomas was able to testify to the extent of the routine reliance of his business upon the accurate recording of account balance information and insufficiency of funds. Therefore, Thomas was an "other qualified witness" and was able to establish competently the elements of the business records exception to the rule prohibiting hearsay.

Relying on the *Elizarraras* test, the court in *United States v. Politano*, No. 86–5686, slip op. at 3 (4th Cir.1987), [829 F.2d 1121 (table) ] held that a "researcher" who was considered to be the custodian of records at one bank branch was an "other qualified witness" regarding similar records from a different bank branch.

A different test which might also assist trial judges in making a determination as to who would be a qualified witness was stated by the Temporary Emergency Court of Appeals: "It is not essential that the offering witness be the one who prepared the business records. Any person in a position to attest to their authenticity is competent to lay the requisite foundation for admissibility [under Fed.R.Evid. 803(6) ]." (Citations omitted.) *Pacific Service Stations Co. v. Mobil Oil Corp*, 689 F.2d 1055, 1062 (1982). This test, of course, may not be directly applicable in a

case such as this where the authenticating witnesses do not belong to the record-making organization.[7] But, in this case, this test combined with Mil.R.Evid. 803(24) conceivably could have allowed reception of the hearsay. *See Richter and Phillips Jewelers and Distrib. v. Dolly Toy Co.*, 31 B.R. 512, 514 n. 1 (Bankr.S.D.Ohio 1983). "To exclude from evidence a highly reliable, highly probative instrument, with no allegation that it is in any way suspect, would ignore both the purposes of the Rules and common sense." *Id.*

 Of course, no system of any sort touched by or created by human hands is free from flaws. Mistakes are made. That is why Mil.R.Evid. 803(6) has an exception prohibiting admission of evidence if the source of the information contained within the proffered evidence is untrustworthy or if the circumstances surrounding the preparation of the proffered evidence are untrustworthy. The burden, however, is on the opponent of a business record to convince the judge by a preponderance of the evidence that the above exception should apply to keep a business record from being admitted. *In re Japanese Electronic Products*, 723 F.2d 238, 288–89 (3rd Cir.1983). Failing this, the opponent is still permitted to present to the members appropriate evidence as to the weight and credibility to be given to the received evidence. Mil.R.Evid. 104(e). And, of course, the stronger the proponent lays the foundation, the greater will be the weight and credibility of the evidence.

Military case law on this subject is sparse. The Court of Military Appeals' holding in *United States v. Wilson*, 24 U.S.C.M.A. 139, 1 M.J. 325 (1976), that the witness be "intimately familiar with the conduct of the firm's operation," 1 M.J. at 328, applies to the predecessor to Mil.R. Evid. 803(6), which was much more strin-

gent because it required the testimony of either the person who made the entry or a witness who had "personal knowledge that the entry was correct." Paragraph 144*c*, Manual for Courts–Martial, United States, 1969 (Rev.). Even so, the Court later held that a witness analogous to Thomas was qualified to lay the requisite foundation. *United States v. Vietor*, 10 M.J. 69 (C.M.A. 1980).

Existing military case law on point is consistent with the federal standards. The witness need not be present during the creation of the record. *United States v. Gans*, 23 M.J. 540, 544 (A.C.M.R.1986). And, as stated by the Air Force Court of Military Review: "[I]t is not essential that the offering witness be the recorder or even certain of who recorded the information, but it is sufficient that the witness be able to identify the record as authentic and state that it was made and preserved in the regular course of business." *United States v. Cordero*, 21 M.J. 714, 715 (1985) (citation omitted).

### E.

 Therefore we hold that the checks in question, in addition to being self-authenticated, were properly authenticated by Tomashiro with regard to the AEB checks, and Sakihama and Morse with regard to the OWAX checks. With regards to the rule barring hearsay, Thomas established the business records exception. For similar reasons, Thomas was qualified to establish the business record exception for the appellant's bank statements prepared by NFCU, in that they were prepared and copies were kept in the regular course of the NFCU's business. The affidavit establishes that they were based on other records which were themselves prepared "at or near the time of the act, condition or event." The affidavit also authenticated

---

7. On the other hand, and we do not so decide either way today, Tomashiro and Sakihama may have been qualified to directly lay the business records exception foundation for the "insufficient funds" stamp, even though not prepared by Tomashiro's and Sakihama's organizations, if their organizations kept the returned checks with the stamps in the regular course of

each organization's respective business and if each organization relied upon the checks and accuracy of the stamps to a degree allowing it to be fairly said that the organizations "integrated" the checks and stamps into their own records. *See United States v. Ullrich*, 580 F.2d 765, 771–2 (5th Cir.1978).

the statements. The challenged exhibits were properly admitted.[8]

## II

■ The appellant also contends that the United States failed to provide him a speedy trial. The appellant was tried within 90 gross days of being placed in pretrial confinement. The very day the appellant made a demand for a speedy trial, presumably pursuant to *United States v. Burton*, 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971), an investigation pursuant to Article 32, UCMJ, 10 U.S.C. § 832, was ordered. The Article 32 was subsequently docketed for 13 days after the demand, but was postponed due to a defense continuance request so that the defense counsel could go on leave. *United States v. McCallister*, 27 M.J. 138 (C.M.A.1988), disposed of the demand prong of *Burton*, but even if it had not, we, like the court in *McCallister*, find that the government proceeded in a timely fashion to dispose of the charges against the appellant.

■ The appellant also asserts the United States failed to give him a thorough and impartial investigation in accordance with Article 32, UCMJ. Error occurred when the investigating officer sought legal advice from an officer-in-charge of the Legal Services Support Team prosecuting the appellant who had actually acted as the prosecutor of the case in preliminary matters. Thus the appearance of an impropriety exists creating a presumption of prejudice to the appellant which the government can overcome only with a showing of no actual prejudice by clear and convincing evidence. *United States v. Payne*, 3 M.J.

354, 357 (C.M.A.1977); *United States v. Freedman*, 23 M.J. 820, 826–7 (N.M.C.M.R. 1987). The trial judge found that the government met its burden; given the length of the contact (less than three minutes), and the nature of the advice sought and given (to follow the Rules of Courts–Martial), we find that the judge's ruling was correct in fact and law.

■ Finally, we note that the trial judge correctly ruled that the notification to the appellant of the charges and specifications did not constitute the notice required to trigger the 5–day statutory period of Article 123a, UCMJ, 10 U.S.C. § 923a, after which nonpayment of the amount due establishes prima facie evidence that the appellant intended to defraud or deceive. *United States v. Jarrett*, 34 C.M.R. 652 (ABR 1964); Paragraph 49(c)(17), Part IV, MCM, 1984. Consequently, in this case, the United States had to rely solely on other circumstantial evidence to prove the appellant's intent to defraud and his knowledge of the insufficiency of funds to honor the checks.

■ The findings of guilty are affirmed. The appellant challenges the appropriateness of the sentence, but after examining the record of trial we find it appropriate and the sentence as approved on review below is also affirmed.

Senior Judge RILEY and Judge MIELCZARSKI concur.

---

**8.** Contrary case law notwithstanding, *see, e.g., United States v. Scholle*, 553 F.2d 1109, 1125 (8th Cir.1977), we find no principled reason to burden computer-generated records with any additional foundational requirements than those which exist for other classes of business records. Hearsay in general is excluded because it is: "... presumed unreliable. The presumption may be rebutted by appropriate proof. *See* Fed.Rule Evid. 803(24) (otherwise inadmissible hearsay may be admitted if circumstantial guarantees of trustworthiness demonstrated)." *Bourjaily*, 483 U.S. at 179, 107 S.Ct. at 2781, 97 L.Ed.2d at 155. For the business records exception, reliability is presumed because "reliance on routine record keeping is essential to ongoing business activity." *In re Japanese Electronic Products*, 723 F.2d 238, 289 (3rd Cir.1983). In other words, although a business record is hearsay, if it is routinely kept in the course of business, it is nonetheless likely enough to be reliable that it overcomes the presumption of unreliability because organizations have their own vested interests in the accuracy of their routine records and operations. The need for accuracy in routine matters is "essential for ongoing business activity." Business activity has no less a need for accuracy of its computer records merely because they are computer records.