# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
TOZZI, HAM, and CHIARELLA[1]
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Sergeant ROBERTO E. TRIGUEROS**
**United States Army, Appellant**

ARMY 20070754

Headquarters, 21st Theater Support Command
James Pohl, Military Judge
Colonel Scott W. Arnold, Staff Judge Advocate

For Appellant:  Captain Sarah E. Wolf, JA; Mr. William E. Cassara, Esquire (on brief).

For Appellee:  Colonel Denise R. Lind, JA; Lieutenant Colonel Francis C. Kiley, JA; Major Christopher B. Burgess, JA; Captain Lynn I. Williams, JA (on brief).

29 March 2010

----------------------------------
OPINION OF THE COURT
----------------------------------

CHIARELLA, Judge:

A military judge sitting as a general court-martial convicted appellant, pursuant to mixed pleas,[2] of rape, indecent assault, and adultery, in violation of Articles 120 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 920, 934 [hereinafter UCMJ].[3]  The military judge sentenced appellant to a dishonorable discharge, confinement for eighty-three months, forfeiture of all pay and allowances, and reduction to the grade of E1.  The military judge also awarded appellant thirty

---

[1] Judge CHIARELLA took final action in this case while on active duty.

[2] Appellant pled guilty by exceptions and substitutions to the lesser-included offense of indecent acts with another.  The court-martial convicted him of the greater offense of indecent assault.

[3] Appellant's charged offenses occurred prior to the effective date of the revision to Article 120, UCMJ, which applies to offenses that occurred on or after 1 October 2007.

days credit against the adjudged confinement. The convening authority approved the adjudged sentence. This case is before us for review under Article 66, UCMJ.

Appellant alleges the military judge erred to his substantial prejudice by denying his request for a mistrial following the discovery, at sentencing, that the trial counsel failed to disclose the rape victim's mental health records in response to a specific defense request. Appellant also contends the evidence was not legally and factually sufficient to support the findings of guilty as to the rape and indecent assault charges. We find appellant's two assignments of error lack merit. Because the nondisclosure of the rape victim's mental health records was harmless beyond a reasonable doubt, the military judge did not abuse his discretion in denying the request for mistrial.

## FACTS

### A.  Indecent Assault of Mrs. JLC

Appellant pled guilty to committing an indecent act with Mrs. JLC by ejaculating on her face while they were in a room with the door open. Appellant contends, however, his actions were consensual and not an indecent assault.

Mrs. JLC first met appellant through her husband, Private First Class (PFC) TC, at a unit organization day on or about 10 July 2006. About a week later, on 18 July, Mrs. JLC, her husband, and appellant went out together socially. On the following night, Mrs. JLC went out with appellant, Specialist (SPC) Jessica Suarez, SPC Mayra Acevedo, and PFC McCallium Davis.

The group visited various clubs and everyone consumed alcohol. Mrs. JLC consumed about three mixed drinks and four shots of tequila within the first hour. While walking to a second bar, Mrs. JLC fell, and appellant helped her walk. Once they arrived at the second bar, Mrs. JLC continued to consume shots of tequila. At one point, appellant took a lemon from Mrs. JLC's drink, put it in his mouth, and only gave it back to Mrs. JLC when she kissed him. The group then went to a third bar. By this time, Mrs. JLC could only remember being awakened as the group prepared to leave. Mrs. JLC vomited while they were waiting for a cab to return to the barracks. Once in the cab, she vomited again in appellant's lap. When the group arrived at the front gate of post, appellant had to help Mrs. JLC find her military dependent identification card.

The group arrived at the barracks at approximately 0200 and decided that Mrs. JLC would sleep in the vacant bedroom of SPC Suarez's suite (two bedrooms with a common area bathroom and a common area kitchen) to avoid bringing her to her husband in such a heavily intoxicated state. Mrs. JLC required assistance from both appellant and PFC Davis to walk into the barracks room. Mrs. JLC remembered

being put on a bed and having all her clothes on except her shoes.  When given a glass of water, Mrs. JLC vomited yet again.  Mrs. JLC could not keep her eyes open and "passed out" after being put on the bed.

Appellant, SPC Suarez, and PFC Davis took turns checking on Mrs. JLC during the night.  Appellant and PFC Davis stayed in SPC Suarez's bedroom after the group returned to the barracks.  The lights remained on in SPC Suarez's bedroom, the common bathroom, and the spare bedroom where Mrs. JLC lay.  After a while, both PFC Davis and SPC Suarez fell asleep, leaving appellant awake to continue checking on Mrs. JLC.

Mrs. JLC remembered waking, feeling she needed to vomit again.  Her body, however, felt very heavy.  When she tried to move, Mrs. JLC had trouble sitting up and was confused about where she was.  Mrs. JLC felt pressure on her genital area, like she was being "fingered," "like something was kind of in me," and saw that her legs were turned at an awkward angle.  While feeling herself being touched,  Mrs. JLC saw appellant kneeling on the bed.  Mrs. JLC could see appellant clearly because all the lights were still on in the bedroom.  Appellant leaned backward and put his hand down by his side.  Appellant's other hand was near his crotch, and Mrs. JLC noticed something shiny that appeared to be an undone pants zipper.  Mrs. JLC also saw appellant's face appeared "turned on."

Mrs. JLC said "no" to appellant three or four times loudly enough to be heard and shook her head.  In response, appellant put his hand over Mrs. JLC's mouth and pushed her back on the bed.  When appellant removed his hand, Mrs. JLC again tried sitting up, said "no," and shook her head.  Appellant again put his hand over Mrs. JLC's mouth and pushed her head down more forcefully, making it difficult for Mrs. JLC to breathe.  Appellant eventually removed his hand from Mrs. JLC's mouth and aligned her head in front of his crotch.  Mrs. JLC also saw appellant's other hand in a clinched fist moving up and down on his penis.  Mrs. JLC then felt something wet hit her face.  She tried pulling her head away, but could not because appellant still held her head.  Mrs. JLC recognized the wetness as semen and knew appellant had ejaculated on her face.  After ejaculating on Mrs. JLC's face, appellant placed her head back on the bed, kissed her shoulder, and told her he would be right back.

Mrs. JLC vomited again.  Appellant returned, first wiping ejaculate from Mrs. JLC's face before wiping her vomit.  Mrs. JLC did not remember anything else until appellant told her she had to go back to her husband's barracks room.  Mrs. JLC arrived while her husband was getting ready for work, went immediately to bed, and fell asleep. Mrs. JLC awoke at about 1000 and began to remember what happened with appellant the previous night.  She went to the bathroom and felt a burning sensation while urinating.  When her husband returned at about 1030, Mrs. JLC told him what happened.  They then went to the military police station where Mrs. JLC provided a statement.

3

## B.  Rape of Mrs. SCR

Appellant met Mrs. SCR through his wife, Judith Trigueros, when Mrs. SCR attended a dinner party at appellant's house.  Mrs. SCR had met Mrs. Trigueros, along with three other women, in a two-week dental assistant course.  The five women decided to celebrate the end of their course with a dinner party at appellant's family quarters.

The event began at about 2000, and, over the course of the evening, Mrs. SCR drank approximately four glasses of wine.  Mrs. SCR testified she is usually not a drinker and only occasionally has a glass of wine when dining out.  However, that evening, Mrs. SCR was relaxed, laughing, and talkative.  Sex was one of the topics of conversation among the five women, in the presence of appellant.  Two of the women left the dinner party together at about 2200, and a third, Miriam Hembrook, left closer to midnight.  While Mrs. Hembrook believed herself well enough to drive home, Mrs. Trigueros insisted on following Mrs. Hembrook, leaving only appellant and Mrs. SCR at appellant's quarters.

Mrs. SCR's memory of subsequent events, while imperfect, was detailed.  For example, she remembered being kissed by appellant—he was "all over [her] with his tongue in [her] mouth"—but could not remember exactly when or where this occurred.  Mrs. SCR also remembered lying "short-wise" on a bed with no idea of how she got to the back bedroom.  Appellant was on top of her, and she felt trapped and unable to move.  Mrs. SCR also felt incredible pain and tearing inside of her vagina while appellant was "thrusting, like hitting so hard" because she was "tense and was not wet."  Both Mrs. SCR's trapped feeling and "pain like [she] never felt before" lasted a few moments.  While feeling like she was in shock, she eventually comprehended what was occurring and said in a voice loud enough to be heard, "I want my husband.  I want Jake.  I want my husband.  I want Jake."  Mrs. SCR remembered appellant's repeated response as "oh baby, baby."

Mrs. SCR rolled away from appellant in an attempt to escape.  Mrs. SCR saw her pants and underwear around one of her ankles.  Appellant quickly rolled Mrs. SCR back, against her will, and got on top of her again.  Mrs. SCR then recognized that appellant had a condom on his penis.  Appellant then leaned on top of her with his weight on her arms and continued to have sex with her.  Mrs. SCR said she did not feel pain at this time; however, she was so exhausted and shocked she felt like she could not function.

Mrs. SCR next remembered being fully dressed and standing in the bedroom doorway (she did not remember putting her clothing on).  She saw blood all over the bed. Mrs. SCR was having her menstrual period, but as a result of taking birth control pills, her periods were not heavy.  Mrs. SCR attributed the blood on the bed to be the result of force and tearing, and not menstrual blood.  Mrs. SCR also

remembered being at the front door of appellant's house and walking down the stairs, but did not remember whether she left the house with anyone.

Mrs. Trigueros testified she drove Mrs. SCR back to her quarters. Though met by her husband upon her arrival at home, Mrs. SCR felt like she was in shock and did not immediately report to her husband what had occurred. Shortly thereafter, while taking a shower, Mrs. SCR began crying and shaking uncontrollably. She then laid on the hallway floor and hysterically kept saying she "didn't want to. I tried to roll away." Mrs. SCR told her husband appellant raped her. Mrs. SCR's husband helped get her dressed, drove her to the military police station where she gave a sworn statement, and then took her to the hospital where a health official performed a rape examination.

## C. Appellant's Court-Martial

In January 2007, appellant's command preferred the rape, indecent assault, and adultery charges against appellant. On 20 April 2007, after an Article 32, UCMJ investigation at which Mrs. SCR testified, the commanding general, 21st Theater Support Command, referred the charges to a general court-martial.

On 25 April 2007, civilian defense counsel submitted a written "Defense Discovery Request," including *inter alia*, "copies of any and all records, to include notes, whether hand-written or otherwise, maintained by any health care provider, to include mental health care such as social workers and the [Army Substance Abuse Program], for any sessions with either Mrs. [JLC] or Mrs. [SCR] . . . ." On 9 May 2007, trial counsel responded to the defense discovery request, stating in relevant part "[t]he Government is not aware of the existence of any such documentation regarding the records of the victims, Mrs. [JLC] and Mrs. [SCR]." In fact, trial counsel had not asked Mrs. SCR whether she had attended mental health counseling before responding to the defense discovery request.

Appellant was arraigned and entered a mixed plea on 26 April 2007. On 14 June 2007, at a bench trial, the military judge found appellant guilty of the contested rape and indecent assault charges. During sentencing, and in response to questioning from civilian defense counsel, Mrs. SCR stated she had attended approximately four mental health counseling sessions following the rape incident. In light of his prior discovery request, civilian defense counsel requested a continuance in order to obtain and review Mrs. SCR's counseling records. The military judge granted the continuance and ordered trial counsel to produce the victim's counseling records, under seal, for the court's in camera review.

Appellant's trial reconvened on 27 June 2007. The military judge reviewed the counseling records furnished under seal by the government during the intervening recess. Although the military judge stated his review of the counseling

records "did not note anything particularly relevant" to the case, he directed that each side have an opportunity to review the records.

Civilian defense counsel moved for a mistrial, alleging the nondisclosed counseling records constituted a violation of *Brady v. Maryland*, 373 U.S. 83 (1963).[4]   Civilian defense counsel argued the nondisclosed information was favorable to the accused and provided avenues to attack Mrs. SCR's credibility because the counseling records indicated, among other things: (1) the victim had a prior counseling experience; (2) the victim was on antidepressant medication; and (3) the victim's last menstrual period began on a day different than what the witness had stated at trial.  Civilian defense counsel also asserted, in the alternative, that Mrs. SCR's counseling records were favorable to the defense because they were unfavorable.  Civilian defense counsel claimed the fact that she sought counseling enhanced her credibility, made the government's case stronger, the defense's case weaker, and thereby would have caused the defense to revisit a possible pretrial agreement.

The military judge recalled Mrs. SCR to obtain additional information prior to ruling on the *Brady* issue and mistrial motion.  Mrs. SCR testified, among other things: (1) she had attended an inpatient clinic at age twelve for an eating disorder; (2) the only medication she took at the time of the rape was birth control, and afterwards she was prescribed one Valium as part of the pap smear exam and a seven-day supply of Ambien for nightmares and trouble sleeping; and (3) her menstrual cycle probably started on the Tuesday of that week in November, a couple of days before the offense, and she was still on her cycle at the time of the incident.

The military judge then announced extensive findings of fact as to each of the specific issues raised by civilian defense counsel, concluding each was harmless. For example, as to Mrs. SCR's memory of her menstrual cycle, the military judge found "any confusion or change of the date . . . when the menstrual cycle started has minimal to little impact on the credibility of Mrs. [SCR]; and, therefore, the nondisclosure, if it was nondisclosed . . . was harmless beyond a reasonable doubt."

The military judge concluded the government's nondisclosure of Mrs. SCR's mental health records, cumulatively and individually, was harmless beyond a reasonable doubt.  Additionally, regarding civilian defense counsel's counter-argument that the nondisclosed records made the government's case stronger and

---

[4] Before hearing the specifics of the defense counsel's motion, the military judge established the legal framework by which he would review the *Brady* violation issue, with which the parties concurred:  whether the nondisclosed information was favorable and material to the accused and, as the nondisclosure was in response to a specific defense request, the government carried the burden to demonstrate that the nondisclosure was harmless beyond a reasonable doubt.

6

may have led to a different tactic regarding a pretrial agreement, the military judge found this did not constitute a *Brady* violation, was speculative, and harmless beyond a reasonable doubt as "there was never a meeting of the minds on the pretrial agreement." The military judge then denied the motion for mistrial. However, based on the government's misrepresentations, the military judge precluded the government from presenting any victim impact evidence or any aggravation evidence in its sentencing case-in-chief.

## LAW AND DISCUSSION

### A. *Denial of Mistrial Motion*

Appellant first alleges the military judge erred by denying his motion for a mistrial following the discovery, at sentencing, that the government had failed to disclose the rape victim's mental health records. Rule for Courts-Martial [hereinafter R.C.M.] 915(a) vests military judges with the discretion to declare a mistrial when "manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings." However, the discussion to the rule advises caution, noting that mistrials are to be used "under urgent circumstances, and for plain and obvious reasons." R.C.M. 915 Discussion; *United States v. Diaz*, 59 M.J. 79, 90 (C.A.A.F. 2003); *United States v. Garces*, 32 M.J. 345, 349 (C.M.A. 1991) (mistrial is a drastic remedy used to prevent miscarriage of justice). Because of the extraordinary nature of a mistrial, military judges should explore the option of taking other remedial action. *United States v. Fisiorek*, 43 M.J. 244, 247 (C.A.A.F. 1995); *United States v. Evans*, 27 M.J. 34, 39 (C.M.A. 1988). Appellate courts will not reverse a military judge's determination on a mistrial absent clear evidence of an abuse of discretion. *United States v. Ashby*, 68 M.J. 108, 122 (C.A.A.F. 2009). A military judge abuses his discretion when his "findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Webb*, 66 M.J. 89, 93 (C.A.A.F. 2008).

As detailed below, we conclude the military judge did not abuse his discretion in denying the mistrial. His findings of fact are fully supported by the record, his view of the law was not erroneous, and his decision was well within the range of reasonable choices available.

### B. *Required Disclosure of Evidence*

The Due Process Clause of the Fifth Amendment guarantees that "criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta,* 467 U.S. 479, 485 (1984); *Webb*, 66 M.J. at 92. That guarantee requires the prosecution to disclose evidence that is material and favorable

to the defense. *Brady*, 373 U.S. at 87; *Webb*, 66 M.J. at 92. Whether undisclosed evidence is "material" is a question of law. *United States v. Morris*, 52 M.J. 193, 198 (C.A.A.F. 1999). As a general matter, when an appellant has demonstrated error with respect to a *Brady* nondisclosure, the appellant is entitled to relief only if there is a reasonable probability that there would have been a different result at trial had the evidence been disclosed. *See United States v. Santos*, 59 M.J. 317, 321 (C.A.A.F. 2004).

Our superior court has previously noted that R.C.M. 701, "which sets forth specific requirements with respect to evidence favorable to the defense . . . implements the Supreme Court's decision in *Brady v. Maryland* . . ." *United States v. Williams*, 50 M.J. 436, 440 (C.A.A.F. 1999) (internal quotations and emphasis omitted). We view our superior court's guidance as requiring us to analyze nondisclosure issues under the statutory and executive order standards set forth by R.C.M. 701 and Article 46, UCMJ, which are broader than the *Brady* constitutional standard. *See Santos*, 59 M.J. at 321; *United States v. Roberts*, 59 M.J. 323, 326-27 (C.A.A.F. 2004). As a result, the government bears the higher burden of proving a nondisclosure in response to a specific request is harmless beyond a reasonable doubt. *Webb*, 66 M.J. 92; *Roberts,* 59 M.J. at 327. Issues of nondisclosure of evidence are reviewed de novo. *See United States v. Eshalomi*, 23 M.J. 12, 21-22 (C.M.A. 1986).

Upon consideration of the entire record, we agree with the military judge that appellant is entitled to no relief under *Brady* as the government's nondisclosure here was harmless beyond a reasonable doubt. The mental health counseling records of Mrs. SCR were not favorable to appellant and did not provide plausible avenues to attack her credibility as the defense alleged. For example, the civilian defense counsel asserted the mental health records indicated the victim's last menstrual period began on a day different than what the witness stated at trial. We find, as did the military judge, that any confusion or change of the date—"a day here, a day there"—regarding when the victim's menstrual cycle started had minimal impact on Mrs. SCR's credibility. Similarly, the fact that Mrs. SCR was taking certain prescription medications after the rape incident was not shown to be helpful or favorable to the defense. Quite simply, even assuming arguendo *Brady* required the government to disclose the victim's mental health records, we find the government's nondisclosure harmless beyond a reasonable doubt.

Appellant also argues, in the alternative, the government's nondisclosure was favorable to him because the information was unfavorable—the mental health counseling records substantially enhanced the victim's credibility and would have changed the pretrial strategy in terms of potentially submitting a pretrial agreement

to the convening authority.  Without expressly stating such, appellant essentially argues a violation of Article 46, UCMJ, and R.C.M. 701.[5]

The military justice system provides for broader discovery than due process and *Brady* require.  *See Santos*, 59 M.J. at 321; *United States v. Adens*, 56 M.J. 724, 731 (Army Ct. Crim. App. 2002).  Article 46, UCMJ, mandates the trial counsel and defense counsel "shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe."  The President has implemented Article 46, UCMJ in R.C.M. 701, which requires the government, upon defense request, to allow inspection of any tangible objects, such as papers and documents, that "are within the possession, custody, or control of military authorities, and which are material to the preparation of the defense."  R.C.M. 701(a)(2)(A).  *See also* R.C.M. 703(a); R.C.M. 703(f)(1).  In particular, the government must, upon request, permit the defense to inspect "[a]ny . . . reports of physical or mental examinations, . . . which are within the possession, custody, or control of military authorities . . . and which are material to the preparation of the defense."  R.C.M. 701(a)(2)(B).  *See also United States v. Stewart*, 62 M.J. 668, 671 (A.F. Ct. Crim. App. 2006).  Although not a common occurrence, our court has previously recognized that an Article 46, UCMJ violation may occur without a coexistent violation of constitutional due process.  *Adens*, 56 M.J. at 732 (government's nondisclosure of inculpatory physical evidence violated a substantial right of the accused irrespective of a due process violation).

We find the government's nondisclosure violated Article 46, UCMJ, and R.C.M. 701, even though it did not violate *Brady*.  However, as the government demonstrated, the nondisclosure was harmless beyond a reasonable doubt and appellant is not entitled to relief.  *See Roberts*, 59 M.J. at 327.

The record reflects civilian defense counsel was aware Mrs. SCR both told her husband and provided a sworn statement to military law enforcement officials that appellant raped her.  Civilian defense counsel was also aware Mrs. SCR sought medical treatment associated with the alleged rape.  Lastly, civilian defense counsel was aware Mrs. SCR testified under oath at an Article 32, UCMJ, hearing.  We find the fact that Mrs. SCR repeated her allegation one additional time, or sought mental health counseling, added little to her credibility.  Accordingly, we find the mental health counseling records did not, as appellant alleges, substantially strengthen the government's case or weaken the defense's case.  Likewise, we find it entirely speculative that appellant would have altered his pretrial strategy and sought a pretrial agreement had he known of the mental health records' existence.  It is also entirely speculative that the convening authority would have approved a pretrial

---

[5] We note appellant failed specifically to raise the nondisclosure error under R.C.M. 701 and Article 46, UCMJ and instead claimed a violation only under *Brady*.

agreement acceptable to the accused as there was never a "meeting of the minds." In sum, the government's nondisclosure was harmless beyond a reasonable doubt.

We also find our prior decision in *Adens* inapposite to the facts and circumstances here in several regards. The trial counsel in *Adens* made an intentional decision to withhold inculpatory physical evidence from the defense counsel with the intent to use it as rebuttal evidence. 56 M.J. at 729. This "impede[ed] the truth-finding process and constitute[d] gamesmanship, which R.C.M. 701 was intended to discourage." *Id.* at 733-34 (citing *United States v. Lawrence*, 19 M.J. 609, 614 (A.C.M.R. 1984)). The nondisclosure here, while negligent, was neither intentional nor done to gain a tactical advantage. More importantly, the nondisclosed information in *Adens* was extremely material; the evidence was "the 'smoking gun' which would stand the defense's 'case on its ear.'" *Id.* at 733. Even assuming arguendo, the evidence here was "material to the preparation of the defense" under R.C.M. 701(a)(2)(B), its nondisclosure was harmless beyond a reasonable doubt because it was not material to the results of the trial. *See Roberts*, 59 M.J. at 326.

Given the government's nondisclosure was harmless beyond a reasonable doubt, we find the military judge did not abuse his discretion by denying the mistrial request. The military judge, in light of the government's misrepresentation and consistent with R.C.M. 915, barred the government from presenting any victim impact evidence and aggravation evidence. Quite simply, the military judge properly explored and enacted another remedial action commensurate with the government's discovery violation.

Lastly, appellant argues the military judge could not properly determine whether a mistrial was appropriate because he was also the finder of fact and had already announced findings. Appellant essentially argues the military judge was unable to make a proper, objective determination regarding the motion for mistrial because he was also the subjective fact-finder. We find no merit in this assertion. It is hardly unusual for legal issues to arise after findings are made, including ones for which mistrial may be a permissible remedy. Both the military judge's roles of fact-finder and judicial arbiter of whether mistrial was appropriate are actions done in an official capacity. *See United States v. Soriano*, 20 M.J. 337, 340 (C.M.A. 1985) (holding "a military judge need not recuse himself solely on the basis of prior judicial exposure . . ."). As detailed above, we find the military judge did not abuse his discretion by denying the mistrial request. The government's nondisclosure was harmless beyond a reasonable doubt. The fact that the military judge was also the fact-finder did not impugn the propriety of the trial court's actions.

We take this opportunity to reiterate the government's duty with regard to the disclosure of evidence in response to specific requests by the defense. In this case, defense specifically requested "copies of any and all records . . . maintained by <u>any</u>

10

health care provider, to include mental health care . . . for any sessions with either Mrs. [JLC] or Mrs. [SCR] . . . ."  Though the government's response that it was "not aware of the existence" of Mrs. SCR's medical records in this case was technically true, it was only because trial counsel failed to actually ask Mrs. SCR if she had previously attended mental health counseling.  Rule for Courts-Martial 701 requires the prosecution "engage in 'good faith efforts' to obtain the [requested] material."  *Williams*, 50 M.J. at 441; R.C.M. 701(a)(2).  The "parameters of the review that must be undertaken outside of the prosecutor's own files" depend[] on the specific relationship of the government entity and the defense request.  *Id.  See also United States v. Simmons*, 38 M.J. 376, 381 (C.M.A. 1993) ("trial counsel must exercise due diligence in discovering [requested reports] not only in his possession but also in the possession, control, or custody of other 'military authorities . . .'").  The government cannot intentionally remain ignorant and then claim it exercised due diligence.

In this case and others like it where there is no dispute over the relevance of the requested material, due diligence requires trial counsel to ask each victim whether she has attended any mental health counseling sessions, investigate the existence of any medical records, and obtain them, employing a subpoena or other compulsory process where necessary.

> The preferred practice is for the military judge to inspect the medical records *in camera* . . . prior to any government or defense access . . . Once reviewed, the military judge makes a ruling either allowing access to both sides, or denying access and resealing the records as an exhibit for appellate review.

*United States v. Briggs*, 48 M.J. 143, 145 (C.A.A.F. 1998).  *See also United States v. Harding*, 63 M.J. 65 (C.A.A.F. 2006) (discussing procedures to employ in response to defense discovery request for sexual assault victim's mental health records); *United States v. Rivers*, 49 M.J. 434, 437 (C.A.A.F. 1998) ("Where a conflict arises between the defense search for information and the Government's need to protect information, the appropriate procedure is an *in camera* review by a judge." (citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 61 (1987)); *United States v. Kelly*, 52 M.J. 773 (Army Ct. Crim. App. 1999).

## C. Legal and Factual Sufficiency

Appellant also alleges the evidence was not legally and factually sufficient to support the findings of guilty to both the rape and the indecent assault charges.  We find this assignment of error is without merit.

The test for legal sufficiency is whether, considering the evidence in the light most favorable to the government, any rational trier of fact could have found the

essential elements of the offense beyond a reasonable doubt.[6] *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987); *United States v. Reed*, 51 M.J. 559, 561-62 (N.M. Crim. Ct. App. 1999), *aff'd.*, 54 M.J. 37 (C.A.A.F. 2000). *See also* UCMJ art. 66(c). The test for factual sufficiency is whether, after weighing all the evidence in the record of trial and making allowances for not having personally observed the witnesses, the appellate court is convinced of the appellant's guilt beyond a reasonable doubt.[7] *Turner*, 25 M.J. at 325. *See also* UCMJ art. 66(c). The standard of review for questions of both legal and factual sufficiency is de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2003); *United States v. Craion*, 64 M.J. 531, 534 (Army Ct. Crim. App. 2006) (citing *Turner*, 25 M.J. at 325). The record clearly demonstrates the evidence here is both legally and factually sufficient to support the findings of guilty as to the rape of Mrs. SCR and the indecent assault of Mrs. JLC.

## 1. Rape of Mrs. SCR

The two elements of rape under Article 120, UCMJ are: (1) that the accused committed an act of sexual intercourse; and (2) that the act of sexual intercourse was done by force and without consent. *Manual for Courts-Martial, United States* (2005 ed.) [hereinafter *MCM*], Part IV, para. 45c(1)(b). In this case, it is undisputed appellant and Mrs. SCR had sexual intercourse. The sole question before this court is whether the evidence was sufficient to prove the second element.

Although listed as a single element, the second element of rape under Article 120, UCMJ, actually comprises two separate components—force and lack of consent. *United States v. Leak*, 61 M.J. 234, 245 (C.A.A.F. 2005) (citing *United States v. Simpson*, 58 M.J. 368, 377 (C.A.A.F. 2003)). These two components are frequently intertwined with regard to proof as the evidence presented on the issue of force may also prove lack of consent. *United States v. House*, Army 20061064 (Army Ct.

---

[6] In resolving questions of legal sufficiency, the appellate court is "not limited to appellant's narrow view of the record." *United States v. Cauley*, 45 M.J. 353, 356 (C.A.A.F. 1996). Rather, "this Court is bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. McGinty*, 38 M.J. 131, 132 (C.M.A. 1993) (quoting *United States v. Blocker*, 32 M.J. 281, 284 (C.M.A. 1991) (internal punctuation omitted). Moreover, "[p]roof beyond a reasonable doubt does not require that the evidence be free from all conflict." *United States v. Rankin*, 63 M.J. 552, 557 (N.M. Ct. Crim. App. 2006), *aff'd*, 64 M.J. 348 (C.A.A.F. 2007).

[7] In cases, as here, in which the credibility of the witnesses is a paramount factor in analyzing the factual sufficiency of the convictions, Article 66(c), UCMJ, also explicitly requires that we "recognize[e] that the trial court saw and heard the witnesses."

Crim. App. 30 Mar. 09) (unpub.). The essence of the offense of rape is "sexual intercourse against the will of the victim." *Leak*, 61 M.J. at 246. Whether the elements of force and lack of consent are met is based upon the totality of the circumstances presented in the case. *United States v. Cauley*, 45 M.J. 353, 356 (C.A.A.F. 1996).

The record, in the form of Mrs. SCR's testimony, clearly shows she did not consent to sexual intercourse with appellant. Mrs. SCR remembers waking up from a night of drinking to find appellant having sexual intercourse with her against her will. She felt extreme pain which was caused by appellant thrusting his penis into her vagina and the fact that she "was not wet" or excited. When she realized what appellant was doing to her, she tried to move but could not because of appellant's body weight on top of her and his restricting her movement. While appellant was having sexual intercourse with Mrs. SCR, she started to call out for her husband but appellant ignored her. When Mrs. SCR attempted to roll away from appellant, he rolled her back, leaned on top of her, and proceeded to have sexual intercourse with her again.

Appellant rests much of his argument on his pre-rape kiss with Mrs. SCR and other minor inconsistencies in the victim's testimony at trial. Such testimony simply does not negate that Mrs. SCR testified consistently on both direct and cross-examination regarding her lack of consent and appellant's use of force during sex. Moreover, as Mrs. SCR's credibility was the paramount factor in analyzing the factual sufficiency of the conviction here, it was the trial court that was able to see and hear the witness actually testify. In sum, our independent review of the evidence, as well as a review of the evidence in a light most favorable to the prosecution establishes the government proved beyond a reasonable doubt that appellant raped Mrs. SCR.

## 2. Indecent Assault of Mrs. JLC

The elements of indecent assault under Article 134, UCMJ are: (1) that the accused assaulted a certain person not the spouse of the accused in a certain manner; (2) that the acts were done with the intent to gratify the lust or sexual desires of the accused; and (3) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. *MCM*, Part IV, para. 63b. As previously noted, appellant admitted to indecent acts with Mrs. JLC inasmuch as he ejaculated on her face, so the sole question before this court is whether appellant's actions were consensual.

Mrs. JLC's testimony clearly showed she did not consent to having appellant ejaculate on her face or touch her genital area. After a night of heavy drinking, Mrs.

JLC remembered awaking and feeling as though she had to vomit. While still trying to get herself up, Mrs. JLC felt someone "finger[ing]" her and then noticed appellant kneeling on the bed next to her, appearing "turned on."

Mrs. JLC said "no" to appellant about three or four times in a voice loud enough to be heard and shook her head. Appellant ignored her repeated protests and attempts to get away from him, covered her mouth with his hand, and otherwise physically restrained her movement.

Appellant essentially argues because of various inconsistencies in Mrs. JLC's testimony about certain events from the night in question, her account of the indecent assault is not credible. For example, appellant argues, contrary to Mrs. JLC's testimony, the victim made suggestive statements and kissed appellant at different times while they were out drinking. We find this argument to be without merit. The evidence shows Mrs. JLC consumed approximately seven to eight drinks and was extremely intoxicated while "bar-hopping." Any inconsistencies in the testimony of Mrs. JLC were, at best, minor and remotely related to whether the subsequent events were in fact consensual. Importantly, Mrs. JLC's description of the indecent assault never changed. In sum, our independent review of the evidence establishes that the government proved beyond a reasonable doubt appellant indecently assaulted Mrs. JLC.

## CONCLUSION

The findings of guilty and the sentence are affirmed.

Chief Judge TOZZI and JUDGE Ham concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

14