UNITED STATES, Appellee,

v.

Anthony N. GARCES, Captain, U.S. Army, Appellant.

No. 64,545.
CM 8802637.

U.S. Court of Military Appeals.

Argued Jan. 8, 1991.

Decided May 29, 1991.

For Appellant: *Captain Michael P. Moran* (argued); *Colonel Robert B. Kirby* and *Captain Timothy P. Riley* (on brief); *Lieutenant Colonel Russell S. Estey.*

For Appellee: *Captain Robert J. Walters* (argued); *Colonel Alfred F. Arquilla, Lieutenant Colonel Daniel J. Dell'Orto, Major Maria C. Fernandez* (on brief); *Captain Clay E. Donnigan.*

## Opinion of the Court

COX, Judge:

Contrary to appellant's pleas, a general court-martial convicted him of one specification of resisting apprehension and five specifications of larceny, in violation of Articles 95 and 121, Uniform Code of Military Justice, 10 USC §§ 895 and 921, respectively. The court-martial sentenced him to be confined and to forfeit $1500.00 pay per month for 3 years, and to be dismissed from the Army. The convening authority approved the sentence, and the Court of Military Review affirmed the findings and sentence in a short-form opinion.

We granted appellant's petition for review to consider whether the military judge erred by admitting computer generated documents as exceptions to the hearsay rule and whether he should have declared a mistrial.[1] Finding no error, we affirm.

## I

The Government tried this case on the theory that appellant had obtained the credit card numbers of two brother officers, Captain N and Chief Warrant Officer B; ordered a large number of items by telephone; and used the credit cards to pay for the orders. Appellant began his scheme by renting a mail box in the name of Captain N from a private mail shipping and receiving company called The Post Box. He used the box as a mailing address to receive goods he ordered using Captain N's VISA card number. When the items arrived, he signed the delivery logs using Captain N's name.

At some point appellant also obtained CWO B's credit card number, and he informed the proprietors of The Post Box that he would be receiving packages for CWO B at the box. Then he used CWO B's credit card number to order a leather jacket, which was delivered to the box and receipted for by appellant as Captain N. He also ordered dietary supplements and a "muscle pump" using the same credit card.

Before the last items were delivered, Captain N and CWO B disputed the charges on their respective bills, and an investigation led to The Post Box, where agents of the Criminal Investigation Command (CID) seized the dietary supplements and muscle pump. They also asked the manager to notify them when the person representing himself as "Captain N" reappeared.

About 1 week later, appellant came to The Post Box to close the box. As arranged, the manager called the CID. When the agents arrived, he identified appellant for them. Appellant saw the agents and fled, being apprehended about 2 blocks away. At the time he was wearing a name tag on his uniform that had "N" on it rather than his own name.

During an interview with the CID agents, appellant admitted the essential facts of his scheme, including placing the orders using the credit card numbers of

---

1. The issues granted review were:

I
WHETHER THE MILITARY JUDGE ERRED IN ADMITTING DOCUMENTS UNDER MILITARY RULE OF EVIDENCE 803(6) WHICH CONTAINED ONE OR MORE LEVELS OF HEARSAY FOR WHICH NO INDEPENDENT EXCEPTION WAS SATISFIED.

II
WHETHER THE MILITARY JUDGE ERRED BY DENYING DEFENSE MOTIONS FOR A MISTRIAL.

Captain N and CWO B. After consenting to a search of his car, appellant turned over to CID a notebook with B's credit card number written in it. Later on, he turned over a leather jacket similar to that ordered on B's credit card.

To connect appellant to those items, the Government offered documentary evidence tracing the flow of telephone orders for the goods. This evidence included documents showing the copies of sales drafts and invoices charged to the accounts of Captain N and CWO B; disputes on charges to the credit cards by Captain N and CWO B; "chargebacks" (*i.e.*, losses) to the firms which supplied the goods; the signature log maintained by The Post Box showing that various packages had been receipted for by "Captain N"; a tracer form and driver's log for a leather jacket; and documents showing the exchange of that jacket by the vendor. Over timely objection, the military judge admitted the documents as records of regularly conducted activity under Mil.R.Evid. 803(6), Manual for Courts–Martial, United States, 1984.[2]

 In support of its position that the documents were admissible, the Government called officers from the card-issuing banks[3] to explain the procedures followed by those institutions when they received notification of the unauthorized use of the credit cards. Next, employees of the corporations that looked into claims of improper credit-card use described the process used to investigate disputed charges and the records (computer and otherwise) that are generated as a result of such action. Finally, employees of the merchants who sold the goods ordered by appellant testified about other documents in the sales chain. These witnesses described the process for taking credit-card orders, assessing losses to merchants, preparing shipping logs, and making tracer requests. However, they were not the persons who made

the actual entries and in some cases were not even the records' custodians.

Appellant concedes that these witnesses understood the procedures used to prepare the documents. However, citing *United States v. Wilson*, 1 MJ 325 (CMA 1976), he argues that this Court should require that the foundation be established by someone "intimately familiar" with the business operations of those firms for which the entries were originally made. *Wilson* was decided prior to adoption by the President of the Military Rules of Evidence. We must now determine the requisite foundation for admissibility under Mil.R.Evid. 803(6).

We have not directly addressed this question, but we note that the rule is in all respects identical to the corresponding Federal Rule. Thus, we look to the Federal Courts of Appeals for guidance in its application. *Cf. -nited States v. Powell*, 22 MJ 141 (CMA 1986); Art. 36(a), UCMJ, 10 USC § 836(a). The Courts of Appeals which have considered this question have rejected the more stringent requirement previously imposed by the common law. All that is necessary now is that the witness be generally familiar with the record-keeping system. *United States v. Hathaway*, 798 F.2d 902 (6th Cir.1986) and cases collected therein. For instance, in *United States v. Colyer*, 571 F.2d 941 (5th Cir.), *cert. denied*, 439 U.S. 933, 99 S.Ct. 325, 58 L.Ed.2d 328 (1978), the Government was allowed to introduce 61 Master–Card purchase tickets on the strength of the testimony of an assistant manager of the issuing bank. The bank itself did not make the sales tickets, but the officer was sufficiently familiar with the process to satisfy the court of the reliability of the information on them.

The requirement that the witness providing the foundation only be generally familiar with the process is eminently reason-

---

**2.** More colloquially, this is known as the business-record exception to the hearsay rule. *See* Drafters' Analysis, Manual for Courts–Martial, United States, 1984 at A22–49 (Change 2).

**3.** Technically the institution which issued the credit card to CWO B was a credit union. However, the two types of institutions do not differ in the processing of credit sales. For ease of discussion the term bank will be used.

able. Modern business dealings no longer rely on the quill pen or the letter press to generate documents. As the military judge observed: "[I]t appears to me that this is the nature of business today." One cannot expect a records custodian to understand all the mechanics of data processing or the intricacies of electronic fund transfers. All that is required is that "the witness is shown not only to have knowledge of the declarant's business, but also some knowledge of the particular activity of the business which generates the report." *See United States v. Dababneh*, 28 MJ 929, 936 (NMCMR 1989). Here the witnesses showed sufficient understanding of the record systems to explain them to the military judge and to establish the reliability of the entries on the documents. Thus, the military judge properly concluded that the documents were admissible under Mil.R. Evid. 803(6). *Cf. United States v. Young Brothers, Inc.*, 728 F.2d 682, 693–94 (5th Cir.), *cert. denied*, 469 U.S. 881, 105 S.Ct. 246, 83 L.Ed. 2d 184 (1984).

■ The only remaining questions are the relevance of the documents and whether their probative value outweighs any potential unfair prejudice or confusion to the trier of fact. Mil.R.Evid. 403. Here the exhibits show that someone used the credit cards of Captain N and CWO B to order goods and that those transactions were not authorized by the owners of the credit cards. Further, the documents served to corroborate appellant's confession that he was the individual who wrongfully used the cards to purchase items by telephone. Therefore, the exhibits were properly admitted by the military judge.

## II

■ Appellant was originally charged with eleven specifications of larceny and one specification each of resisting apprehension and violation of a general regula-

tion by carrying an illegal weapon, a knife. In the preliminary stages of the trial, it became obvious that the Government would not be able to proceed with several allegations of larceny. For reasons not clear, it was unable to obtain attendance of a number of civilian witnesses.[4] On its own motion, it moved to dismiss two specifications of larceny which would have been the subject of testimony by those witnesses.

Next, during litigation of admissibility of the business records discussed above, the Government disclosed that it did not intend to call employees of two other mail-order houses to testify as to their losses.[5] As a result, the military judge dismissed the four specifications related to those entities *sua sponte*. One additional specification was amended to allege attempted larceny, and the military judge redesignated that offense as "Charge IV." However, before evidence was taken, the Government moved to dismiss that offense after "contact with the witnesses." Finally, at the conclusion of the Government's case, defense counsel moved for and was granted a finding of not guilty on the offense of carrying an illegal weapon.

Defense counsel had moved for a mistrial at several points prior to conclusion of the Government's case. After his motion for a finding of not guilty was granted, he renewed the request, arguing that merely exposing the members to this offense was so harmful as to require that remedy. The military judge denied the motion and recalled the members. He gave a clear instruction on the effect of a finding of not guilty, and he satisfied himself that the members understood the instruction and its impact.

A final problem arose during the defense's case. Defense counsel called Captain N, who testified that during a deployment, he had given appellant a general

---

4. Trial counsel told the military judge that the witnesses for one specification would not "comply with our subpoena." It is not clear whether the Government had attempted to enforce the subpoena by use of the office of the United

States Attorney or not. *See United States v. Hinton*, 21 MJ 267 (CMA 1986).

5. These corporations also refused to comply with subpoenas.

power of attorney. While a copy of the document could not be produced, a general agreement was reached among all parties that one of the alleged thefts occurred during the time that the power of attorney was in effect. As a result, the Government moved to dismiss yet another specification of larceny.

Defense counsel once more moved for a mistrial. Notwithstanding the military judge's clear dissatisfaction with the Government's handling of this case to that point, he concluded that the interests of justice did not require this action.[6] Instead he recalled the members and once more instructed them that they were to draw no inference from the fact that appellant had been charged with the offense. He followed this with a general question as to whether any member had any problems with the spillover effect of this or any other specification.

The military judge then allowed counsel to conduct individual *voir dire* on the subject. Each member assured the military judge that evidence he had heard on the offenses removed from the court-martial's consideration would not affect his decision either as to findings or sentence. Finally, the military judge reiterated his instructions during the charge on findings.

■ While it is trite to say so, it is also true that a mistrial is a drastic remedy and is reserved for only those situations where the military judge must intervene to prevent a miscarriage of justice. *United States v. Jeanbaptiste*, 5 MJ 374 (CMA 1978); *see also United States v. Morris*, 13 MJ 297, 301 (CMA 1982) (Cook, J., concurring in the result). When a military judge is satisfied that the Government has not engaged in intentional misconduct during the trial and concludes that an instruction will cure the potential error, such a procedure is "preferred." *United States v. Evans*, 27 MJ 34, 39 (CMA 1988), *cert. denied*, 488 U.S. 1011, 109 S.Ct. 797, 102 L.Ed.2d 788 (1989); *accord United States v. Pas-*

*tor*, 8 MJ 280, 284 (CMA 1980). Therefore, the real question is "whether the curative instruction avoided prejudice to" the accused, not whether the military judge abused his discretion. *United States v. Evans*, 27 MJ at 39.

Even where the possibility of harm to the accused has been acute, both the Supreme Court and this Court have indulged in a "crucial assumption" that such instructions will be followed in the absence of evidence to the contrary. *Tennessee v. Street*, 471 U.S. 409, 415, 105 S.Ct. 2078, 2082, 85 L.Ed.2d 425 (1985); *United States v. Evans*, 27 MJ at 40; *cf. Lakeside v. Oregon*, 435 U.S. 333, 340, 98 S.Ct. 1091, 1095, 55 L.Ed.2d 319 (1978); *United States v. Garrett*, 24 MJ 413 (CMA 1987).

Here, the instruction was given immediately after the charges were dismissed, and then it was repeated during the general charge on findings. Moreover, in this case, the military judge questioned the members as to their ability to maintain an independent mind regarding the latter offenses and allowed defense counsel to do the same. Under these circumstances, we are satisfied that the instruction coupled with the inquiry of the members as to the potential impact of the dismissed charges served to prevent any harm to appellant. *See United States v. Evans*, 27 MJ at 41.

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge SULLIVAN concurs.

EVERETT, Senior Judge (concurring):

I concur in the majority opinion. Nonetheless, the situation leading to litigation of the matter of a mistrial causes me a great deal of concern.

The majority opinion fully sets out the numerous instances of specifications and charges being dismissed for want of adequate prosecution. It is clear from a reading of the record that the military judge understandably was not pleased with the

6. He did this despite threatening the Government with such a ruling shortly before it became clear that the United States had no idea

that CPT N had given the power of attorney to appellant.

Government's trial of this case. Indeed, at one point, he was moved to remark that the prosecution was "not entitled to screw ... [the case] up so badly and expect me to give so many corrective instructions in an attempt to erase your failure to get evidence in before the court—out of the court's mind."

As remedy for this parade of government blunders, appellant repeatedly sought declaration of a mistrial. RCM 915, Manual for Courts–Martial, United States, 1984, provides:

> The military judge may, as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings....

The Discussion of this rule amplifies it thusly:

> [A] mistrial may be appropriate when inadmissible matters so prejudicial that a curative instruction would be inadequate are brought to the attention of the members....

This case comes extremely close to being such an instance.

The military judge employed *extraordinary* measures to safeguard the efficacy of these proceedings. He excoriated the prosecutors and their apparent lack of preparation or experience in trying this kind of case; he noted the lack of cooperation that the prosecutors seemingly were getting from the command in one respect; he constantly was alert to flaws in the prosecution that necessitated his dismissing the specifications discussed in the majority opinion; and, most importantly, he gave extensive and sensitive instructions to the officer members about what he had done and what their task was. Indeed, it is only these remarkable judicial efforts that permit me to concur in the decision here that appellant was not prejudiced by the refusal of the military judge to grant his requests for mistrial.

Ironically, however, it may well be that, under these unusual circumstances, the military judge's vigilance might actually have *increased* the potential damage to appellant from the Government's bungling. When a court of members is faced, time and again, with dismissal of one specification after another, they might reach the point where they infer that what finally remains is pretty solid against the accused or the judge would have thrown that out, too.

This potential prejudice to appellant troubles me. I realize, though, that it is only speculative; there is no expressed indication in the record that it actually arose. Accordingly, I join with the majority in concluding that—thanks to a truly professional performance by the military judge—appellant received a fair trial notwithstanding the botched efforts of the prosecution.