# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
TOZZI, CELTNIEKS, and BURTON
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Sergeant JOSEPH C. BOZICEVICH, JR.**
**United States Army, Appellant**

ARMY 20110683

Headquarters, 3d Infantry Division
Tara A. Osborne, Military Judge
Colonel Jonathan C. Guden, Staff Judge Advocate (pretrial)
Colonel Francisco A. Vila, Staff Judge Advocate (recommendation)
Colonel Luis O. Rodriguez, Staff Judge Advocate (addendum)

For Appellant: Captain Patrick J. Scudieri, JA; William E. Cassara, Esquire (on brief); Captain Cody D. Cheek, JA; William E. Cassara, Esquire (on amended brief and reply brief).

For Appellee: Colonel Mark H. Sydenham, JA; Lieutenant Colonel A.G. Courie III, JA; Major Steven J. Collins, JA; Captain Tara E. O'Brien, JA (on brief); Colonel Mark H. Sydenham, JA; Lieutenant Colonel A.G. Courie III, JA; Major Anne C. Hsieh, JA; Captain Tara E. O'Brien, JA (on amended brief).

13 June 2017

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

TOZZI, Senior Judge:

A panel with enlisted representation, sitting as a general court-martial, convicted appellant, contrary to his pleas, of two specifications of premeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918 (2006 & Supp. I 2008) [hereinafter UCMJ]. The panel sentenced appellant to a dishonorable discharge, confinement for life without eligibility for parole,

forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the adjudged findings and sentence.

This case is before us for review pursuant to Article 66, UCMJ. Appellant raises nine assignments of error, four[1] of which warrant discussion but no relief. We find the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), are without merit.

## BACKGROUND

On 14 September 2008, at Patrol Base Jurf as Sahkr, Iraq, appellant shot and killed Staff Sergeant (SSG) DD and Sergeant (SGT) WD when they attempted to administer a counseling statement to him. Appellant was heard shouting, "I'm going to kill you" before firing his rifle at SSG DD. Eyewitnesses saw appellant continue to shoot his rifle while SSG DD was running away from appellant and after SSG DD collapsed and pleaded for appellant to stop. Sergeant WD was found fatally shot, lying in the Joint Security Station where the attempted counseling took place. Appellant was immediately apprehended after shooting his victims and was heard stating, "I did it so what." At trial, appellant testified he acted in self-defense after SSG DD and SGT WD drew their weapons and threatened to shoot him if he did not sign the counseling statement.

On 2 October 2008, charges were preferred against appellant for premeditated murder. On 7 July 2009, the convening authority referred the charges as a capital case to a general court-martial.

## LAW AND DISCUSSION

### A. Discovery Violations and Judicial Remedies

The Due Process Clause of the Fifth Amendment requires the prosecution to disclose evidence that is material and favorable to the defense. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). This requirement exists whether there is a general request or no request at all. *United States v. Agurs*, 427 U.S. 97, 107 (1976). Under due process discovery and disclosure requirements, the Supreme Court has "'rejected any . . . distinction between impeachment evidence and exculpatory evidence.'" *United States v. Eshalomi*, 23 M.J. 12, 23 (C.M.A. 1986) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)). "[W]hen an appellant has demonstrated error with respect to nondisclosure, the appellant will be entitled to relief only if there is a

---

[1] We address appellant's first two assignments of error in the same section below because they are controlled by a similar body of law concerning discovery violations and the discretion of military judges to craft appropriate remedies.

reasonable probability that there would have been a different result at trial if the evidence had been disclosed." *United States v. Santos*, 59 M.J. 317, 321 (C.A.A.F. 2004).

However, "[t]he military justice system provides for broader discovery than due process and *Brady* require." *United States v. Trigueros*, 69 M.J. 604, 610 (Army Ct. Crim. App. 2010). In courts-martial, Congress provides both trial and defense counsel with an "equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe." UCMJ art. 46. Under the Rules for Courts-Martial [hereinafter R.C.M.], disclosure by the government generally falls into two categories: (1) information the trial counsel must disclose without a request from the defense; and (2) information the trial counsel discloses upon an appropriate defense request. *United States v. Shorts*, 76 M.J. 523, 530 (Army Ct. Crim. App. 2017) (comparing R.C.M. 701(a)(1), (a)(3), (a)(4), (a)(6), with R.C.M 701(a)(2), (a)(5)). "If it falls into the first category, the defense need not request it—they are always entitled to the evidence. In the latter category, the [trial counsel] is responding to a defense request." *Id.* Therefore, "whether the trial counsel exercised reasonable diligence in response to the request will depend on the specificity of the request." *Id.*

When either party fails to meets its discovery obligations, a military judge has broad discretion in crafting an appropriate remedy for the nondisclosure. *See* R.C.M. 701(g)(3); *United States v. Stellato*, 74 M.J. 473, 488-89 (C.A.A.F. 2015) (explaining the broad authority of a military judge to remedy discovery violations); *United States v. Bower*, 74 M.J. 326, 326 (C.A.A.F. 2015) (summ. disp.) ("Because a [military] judge has broad discretion and a range of choices in crafting a remedy to cure discovery violations and ensure a fair trial, [appellate courts] will not reverse so long as his or her decision remains within that range."); *United States v. Pomarleau*, 57 M.J. 351, 364-65 (C.A.A.F. 2002) (reviewing for an abuse of discretion a military judge's decision to exclude evidence that the defense failed to disclose in a timely manner).

*1. Trial Remedies for Disclosure Violations*

In this case, trial defense counsel alleged two discovery violations that appellant now assigns as errors for insufficient judicial remedies. First, the defense alleged the government failed to disclose notes from its investigator, Mr. Garland Slate [hereinafter "Slate notes"], which documented specific instances of appellant's behavior that could support the conclusion of Dr. Thomas Grieger, one of the defense experts, that appellant suffered from a delusional disorder. The defense argued this information was discoverable even without a specific request because it "tended to negate or reduce Appellant's degree of guilt and tended to reduce the punishment." Second, the defense claimed the government failed to disclose

3

information from Ms. LD that SSG DD threatened her with a gun during an unrelated argument [hereinafter "LD statement"].

After reviewing the Slate notes in their entirety, the military judge found:

> They contain[ed] inculpatory material. They also contain[ed] material favorable to the defense that the government was required to disclose to the defense under RCM 701(a)(6) at a minimum with respect to sentencing. The government intentionally withheld this material in a good faith but mistaken belief that it did not need to be disclosed to the defense. There was not intentional prosecutorial misconduct.

The military judge did not find any specific prejudice to appellant from the untimely disclosure because the Slate notes were "not inconsistent with Dr. Grieger's testimony" and "after having read the interview notes, his diagnosis would not change . . . ." Nevertheless, to cure any potential prejudice "that could be caused if one were to infer from the cross-examination that [appellant] recently [feigned] the symptoms of delusional disorder and to ameliorate any harm otherwise caused by the government's untimely disclosure," the military judge fashioned the following remedy:

> [T]he court grants the defense wide latitude to recall Dr. Grieger and to go into [appellant's] specific instances of behavior, history, and events that support or are consistent with delusional disorder. The government will not be permitted to cross-examine Dr. Grieger on these matters. The government will not be permitted to present any evidence in rebuttal of Dr. Grieger's testimony. The government will be allowed to cross-examine and rebut the testimony of any other experts the defense chooses to call, and the court will also give an instruction to the members.
>
> . . . .
>
> Now, let me be clear with counsel just in case there is any ambiguity, which I do not think there is. Just so there is no mistake; Defense, if you call any other experts other than Dr. Grieger, even if they testify to the same thing that Dr. Grieger testifies to, the government is going to be allowed to cross-examine them or to put on rebuttal testimony to those experts witnesses. My ruling goes

4

> simply to Dr. Grieger, and I am also going to allow you,
> Defense, when you put Dr. Grieger back on, when I said
> "wide latitude," I will also allow you to ask leading
> questions.

At the close of the defense case but before government's rebuttal, the military judge expanded her previous remedy to preclude the government from calling two additional witnesses "because they specifically were witnesses that had been interviewed by Garland Slate, your investigator, that you had for quite some time and did not disclose because you misidentified that you were supposed to disclose that information." She also limited the testimony of the remaining government witnesses about the victims' character for peacefulness. The military judge, however, denied the defense motion to strike Ms. Cathy Rassmussen's testimony about appellant's character for peacefulness. In short, the military judge did "not believe that it [was] a necessary remedy for the government's failure to timely disclose Mr. Slate's interview notes that Ms. Rassmussen's testimony with regard to character for peacefulness be stricken." Instead, she found there were several instances in appellant's testimony that she believed "placed his character for peacefulness at issue" and the government was "entitled to rebut not only specific evidence that defense introduces but also any reasonable inferences which may be drawn from such evidence."

Regarding the LD statement, the military judge found trial counsel's late disclosure of the potential impeachment evidence "was grossly negligent" and a *Brady* violation. Although she concluded the alleged specific instance of misconduct in the LD statement was inadmissible under Military Rule of Evidence [hereinafter Mil. R. Evid.] 403 and Mil. R. Evid. 404(b), the military judge stated it was potential support for "opinion [or] reputation testimony of the victim's character trait for violence . . . ." Defense counsel again moved the military judge to declare a mistrial, but the military judge denied the request. As a lesser remedy for the untimely disclosure, the military judge offered to strike Dr. Grieger's testimony about appellant's delusion disorder, which would allow the defense to pursue a self-defense strategy without reference to appellant's mental health. After weighing the strategic implications of the lesser remedy, defense counsel declined.

### 2. *Appellate Review of Judicial Remedies*

On appeal, this court reviews questions regarding discovery requirements de novo. However, we review the sufficiency of judicial remedies crafted to cure discovery violations for an abuse of discretion. *Stellato*, 74 M.J. at 480. Neither the government nor appellant challenges the military judge's findings regarding the asserted discovery violations. Instead, the parties disagree about the sufficiency of the military judge's remedies. After a careful review of the record, we find the

military judge did not abuse her discretion in crafting remedies for the disclosure violations.

As an initial matter, we note the high standard before declaring a mistrial: "when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings." R.C.M. 915(a). Because a mistrial is such an "unusual and disfavored" remedy, it "should be applied only as a last resort to protect the guarantee for a fair trial." *United States v. McFadden*, 74 M.J. 87, 89 (C.A.A.F. 2015) (internal quotation marks and citation omitted). *See* R.C.M. 915(a) discussion ("The power to grant a mistrial should be used with great caution, under urgent circumstances, and for plain and obvious reasons."). Thus, when a military judge determines the extreme remedy of a mistrial is unwarranted, appellate courts will not reverse this decision absent "findings of fact [that] are clearly erroneous, . . . an erroneous view of the law, or the military judge's decision . . . is outside the range of choices reasonably arising from the applicable facts and the law." *Stellato*, 74 M.J. at 480 (internal quotation marks and citation omitted).

Here, appellant's speculation that the government "took affirmative steps to shape [the] evidence *before* it made any disclosures" fails to meet the high standard for discounting the military judge's findings of gross negligence as opposed to intentional misconduct. In addition, appellant's speculation that he would have pursued a different trial strategy had the LD statement been timely disclosed similarly fails to meet this high standard. *See Trigueros*, 69 M.J. at 610 (finding the government's nondisclosure harmless beyond a reasonable doubt after rejecting appellant's speculative claim that absent the nondisclosure he "would have altered his pretrial strategy"). As is the case here, when a military judge "is satisfied that the Government has not engaged in intentional misconduct . . . and concludes that an instruction will cure the potential error, such a procedure is 'preferred.'" *United States v. Garces*, 32 M.J. 345, 349 (C.M.A. 1991) (citations omitted). Accordingly, we find no abuse of discretion when the military judge determined the circumstances in this case failed to justify such an extreme remedy.

Looking next to the remedies proposed and implemented, we find they sufficiently cured any potential prejudice from the untimely disclosures. "As a general matter, when an appellant has demonstrated error with respect to a *Brady* nondisclosure, the appellant is entitled to relief only if there is a reasonable probability that there would have been a different result at trial had the evidence been disclosed." *Trigueros*, 69 M.J. at 609 (citing *United States v. Santos*, 59 M.J. 317, 321 (C.A.A.F. 2004)). Appellant asserts the untimely disclosure of the investigator statements withheld evidence that supported Dr. Grieger's conclusion that appellant suffered from a delusional disorder. As a remedy, the military judge permitted defense to recall Dr. Grieger to give unchallenged expert testimony. The military judge also offered the defense an opportunity to strike Dr. Grieger's

testimony and essentially present a classic self-defense argument to the panel without reliance on a mental health diagnosis. This multifaceted remedy along with the late but prefindings disclosure of the Slate notes and LD statement sufficiently cured any potential prejudice from the untimeliness of the government's disclosure.

Even assuming the military judge abused her discretion in crafting lesser remedies by refusing to strike Ms. Rasmussen's testimony or admit the LD statement, we find no prejudice because of the overwhelming evidence of appellant's guilt in this case. Appellant's murders of SSG DD and SGT WD were immediately detected. Appellant's murder of SSG DD was preceded and followed by incriminating statements. Appellant screamed, "I'm going to kill you" before firing his rifle, and admitted "I did it so what" immediately afterwards. Eye witnesses saw appellant continue his attack on SSG DD under circumstances precluding any colorable claim of self-defense, which included shooting SSG DD while he was running away from appellant. The physical evidence also corroborated appellant's admissions and eyewitness testimony. Accordingly, even if we assume the military judge erred in crafting a sufficient remedy for constitutional discovery violations, the circumstances did not warrant a mistrial and the refusal to strike Ms. Rasmussen's testimony or admit the LD statement was harmless beyond a reasonable doubt.

### B. Evidentiary Ruling by Military Judge

"'A military judge's decision to admit or exclude evidence is reviewed for an abuse of discretion.'" *United States v. Bowen*, 76 M.J. 83, 87 (C.A.A.F. 2017) (citation omitted). "'An abuse of discretion occurs when a military judge either erroneously applies the law or clearly errs in making his or her findings of fact.'" *Id.* (citation omitted). Thus, "[t]he abuse of discretion standard calls 'for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous.'" *United States v. Baker*, 70 M.J. 283, 287 (C.A.A.F. 2011) (citation omitted).

If this court finds an abuse of discretion, it then reviews de novo the prejudicial effect of the ruling—whether the evidence substantially influenced the findings or sentence. *Bowen*, 76 M.J. at 87; *United States v. Griggs*, 61 M.J. 402, 410 (C.A.A.F. 2005). Prejudice from an erroneous evidentiary ruling is evaluated by weighing "(1) the strength of the [g]overnment's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *United States v. Roberson*, 65 M.J. 43, 47-48 (C.A.A.F. 2007) (internal quotation marks and citations omitted).

"'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Mil. R. Evid. 801(c). Normally, hearsay is not admissible absent an

exception. Mil. R. Evid. 802. As a hearsay exception, a witness may offer testimony concerning:

> A statement of the declarant's then existing *state of mind*, emotion, sensation, or physical condition (such as intent, plan motive, design, mental feeling, pain, and bodily health), *but not including a statement of* memory or *belief to prove the fact* remembered or *believed* unless it relates to the execution, revocation, identification, or terms of declarant's will.

Mil. R. Evid. 803(3) (emphasis added).

In this case, defense counsel sought to elicit on cross-examination testimony from SSG MM as follows:

> Q: [Appellant] asked to leave your platoon because everyone was out to get him. *Isn't that true*?
>
> ATC3: Objection. Hearsay.
>
> CDC: It's not offered for the truth of the matter asserted. It's offered for his *state of mind*.
>
> MJ: Sustained.
>
> CDC: Sustained, Your Honor?
>
> MJ: Yeah. The objection is sustained. Give me an exception to hearsay.
>
> CDC: It's not offered for the truth of the matter asserted. It's offered as to *what my client believed* his then present sense.
>
> MJ: Your client's present sense impression?
>
> CDC: Is a description of what he said -- why he said it.
>
> MJ: Not in the *form* of that question. Sustained.

8

(emphasis added). In response to trial counsel's objection to hearsay, defense counsel offered three distinct theories of admissibility.[2] First, defense counsel claimed the statement "was not offered for the truth of the matter asserted[,]" which places the statement outside the definition of hearsay. Second, defense counsel offered the "state of mind" exception under Mil. R. Evid. 803(3). Third, defense counsel asserted the "present sense" impression exception under Mil. R. Evid. 803(1).

Here, the military judge identified the *form* of the question as requiring a hearsay exception because it elicited an out-of-court statement by asking whether it was *true*. If the focus of the question was merely whether appellant asked SSG MM to leave the platoon, it was non-hearsay because SSG MM, as the declarant testifying at trial, could only assert as fact that appellant asked to be transferred. If, however, the focus of the question was on the truth of the substance of appellant's belief (i.e., everyone was out to get him), then the state of mind exception could not apply to prove the fact believed nor would it qualify as a present sense impression. Accordingly, the military judge did not err in requiring a hearsay exception or at least a clarification regarding the form of the question.

After sustaining the objection, defense counsel attempted to rephrase the question to SSG MM as follows:

> Q. Did [appellant] tell you why he wanted to leave the unit?
>
> ATC3: Objection. Hearsay and relevance.
>
> CDC: Your Honor, this witness was asked repeatedly about counseling [appellant]. As you pointed out -- yes, Your Honor. Once the government has opened that door, I'm allowed to explore it.

---

[2] We recognize defense counsel's discussion of hearsay, in the rush of trial, contained an element of imprecision. Claiming a statement was made as a "present sense" impression is not the same as claiming it is "not offered for the truth of the matter asserted." Similarly, "state of mind" is not part of the "present sense impression" exception; it is part of the "then existing mental, emotional, or physical condition" exception. Hearsay exceptions are based on specific indicia of reliability (e.g., made as a present sense impression, made while under the excitement of an event, made for the purpose of medical treatment, etc.), which justify the admission of a statement for the truth of the matter asserted notwithstanding the general prohibition against hearsay. Here, we resolve this imprecision by addressing the theories of admissibility as being offered in the alternative.

At this point, the military judge excused the members for an Article 39(a), UCMJ, session. Then, defense counsel continued with his relevance arguments concerning the "rule of completeness" under Mil. R. Evid. 304(h)(2) and whether trial counsel "opened the door" during direct examination. The military judge rejected both of defense counsel's relevance arguments. First, the military judge found the rule of completeness did not apply because trial counsel had not offered an admission or confession from appellant during the counseling sessions. The rule of completeness is only triggered after "part of an alleged admission or confession is introduced against the accused . . . ." Mil. R. Evid. 304(h)(2). Second, because trial counsel did not introduce the substance of any statement from the counseling sessions, trial counsel had not "opened the door" to cross-examination about the substance of those conversations.

After the military judge rejected the arguments above, defense counsel continued his argument as follows:

> CDC: This witness testified that my client left first platoon and went to second platoon. The reason why he left is not offered for the truth of the matter asserted. It's offered for what my client believed the reason he wanted this transfer. It's a statement of his state of mind, Your Honor, not the fact that everyone was out to get [appellant] because we don't believe that's true, but [appellant] stated that he believed that to be true and it's not hearsay. It's not offered for the truth of the matter asserted, it's offered to demonstrate what my client's state of mind was when he was transferred from one platoon to the other at his own request.
>
> . . . .
>
> CDC: It's relevant to my client's mental state, which is admissible -- which will be -- which we have an expert witness to testify about, and it's not offered for the truth of the matter asserted, therefore it is not hearsay. It is relevant and it is admissible and therefore should be admitted. It tends to prove a fact of consequence to the case, my client's state of mind.
>
> MJ: I got your theory of relevance. Again, confusion on theory of relevance and theory of admissibility. Your theory of admissibility is ----

CDC:  Not offered for the truth of the matter asserted, therefore it is non-hearsay.

MJ:  *Then why are you offering it?*

CDC:  Because it tends to prove my client's state of mind.  It's not offered to show that everyone was out to get him.  It's offered to show that [appellant] believe[d] that and it demonstrates that this is a matter that had come up long before the shooting, therefore it takes away the argument that we created some sort of defense.

MJ:  I don't understand that.

CDC:  That our expert basically cooked this up without having a factual basis for it, Your Honor.

MJ:  *But we haven't heard any expert testimony or anything.  There's never been -- there has not been an attack or anything as to your expert's testimony that you may have "cooked this up."  Your expert hasn't even testified.  We're on the prosecution's case in direct.*

CDC:  I understand.  I understand that.  So, we're establishing why this witness testified my client went from one platoon to the other.  It was at his request and it was for -- he stated the reason.  It's not offered for the truth of the matter asserted.  It's offered to show my client's state of mind at the time, Your Honor.  It is non-hearsay.  That's why it is admissible.  It is relevant because it does tend to show my client's state of mind.

. . . .

MJ:  Your objection is sustained.  Call the members back in.

CDC:  Objection to that ruling, Your Honor.

MJ:  I understand.

(emphasis added).  Based on defense counsel's clarification, we agree the question called for either non-hearsay regarding what appellant said or state-of-mind evidence regarding what appellant believed.  What remains unexplained is a relevant basis for asking this question *at this point of the trial*.  Bolstering the defense expert's

11

testimony was premature during the government's case-in-chief because the expert's testimony had not been offered, much less attacked. Evidence must be relevant to be admissible whether it is non-hearsay or hearsay under an established exception. It is not enough for evidence to be *potentially* relevant if and when expected testimony is offered and attacked. Therefore, the military judge did not err when sustaining the government's objection on the basis of relevance.[3]

Moreover, even if relevant, the probative value of appellant's desire to transfer to another unit two years before killing SSG DD and SGT WD is marginal at best. Thus, appellant was not prejudiced by the military judge's ruling. First, as noted above, the government's case was strong because of the testimonial and physical evidence in this case. Second, the defense's case was weak, particularly in light of appellant's admissions. Third, the materiality of SSG MM's expected response was low because it was cumulative of the same evidence presented to the panel later in the trial, most directly during appellant's testimony.[4] Its materiality was also low because, as defense counsel repeated multiple times, SSG MM's testimony was not offered for the truth that anyone was actually out to get appellant. It was merely offered for the assertion that appellant believed people were out to get him prior to the murders. Fourth, the quality of the evidence was relatively low, particularly when compared to the relatively high-quality expert testimony that was admitted about appellant's delusional disorder. Therefore, any error in the military judge's hearsay analysis was harmless in light of the strength of the government's case, the weakness of the defense's case, and because the evidence in question was immaterial and of relatively low quality.

---

[3] While the military judge later explained the basis of her ruling as the inapplicability of Mil. R. Evid. 803(3), this explanation was part of her larger analysis that if the statement was not offered for the truth it was irrelevant. Even assuming, *arguendo*, the military judge erred in her analysis, she reached the correct result in sustaining the objection because SSG MM's response was irrelevant at this point in the trial. Accordingly, we can still affirm the military judge's ruling on appeal. *See United States v. Carista*, 76 M.J. 511, 515 (Army Ct. Crim. App. 2017) (explaining the "tipsy coachman" doctrine as a basis for appellate courts to affirm a trial court ruling that reaches the right result for the wrong reasons so long as there is any basis that would support the judgement in the record).

[4] For example, in his sworn testimony, appellant confirmed he switched platoons at his own request in March 2008. He also described a situation when he felt vindicated even though other members of his unit "always laughed at [him] and thought [he] didn't know what [he] was . . . talking about . . . ." In addition, he admitted to telling SGT Christopher Muse that he was afraid every noncommissioned officer was out to get his rank.

### C. Ineffective Assistance of Counsel

The Sixth Amendment guarantees an accused the right to the effective assistance of counsel. *United States v. Gooch*, 69 M.J. 353, 361 (C.A.A.F. 2011) (citing *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001)). To establish his counsel was ineffective, appellant "must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361-62 (C.A.A.F. 2010) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Although appellate courts review both prongs of the *Strickland* analysis de novo, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. *See United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015); *United States v. Mazza,* 67 M.J. 470, 474 (C.A.A.F. 2009). Accordingly, we do not assess counsel's actions through the distortion of hindsight; rather we consider counsel's actions in light of the circumstances of the trial and under the "strong presumption that counsel's conduct falls within the wide range of professional assistance . . . ." *Strickland*, 466 U.S. at 689.

In the context of counsel's pretrial preparation, the Supreme Court has held:

> [the] strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, *counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary*. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id*. at 690-91 (emphasis added). Similarly, our superior court has echoed the need for deference by explaining: "'[appellate courts] address not what is prudent or appropriate, but only what is constitutionally compelled.' The Supreme Court has 'rejected the notion that the same [type and breadth of] investigation will be required in every case.'" *Akbar*, 74 M.J. at 380 (citations omitted).

Moreover, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. "[T]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the

legal system. The purpose is simply to ensure that criminal defendants receive a fair trial." *Id.* at 689. "Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 691-92.

### 1. Ginn *Analysis*

Here, appellant was represented at trial by one civilian defense counsel and two military defense counsel. On appeal, appellant claims he received ineffective assistance from his trial defense team because they failed to investigate and use the potentially exculpatory information he gave them. Specifically, appellate alleges he "provided his defense team with viable evidence that SSG [DD] and SGT [WD] had previously threatened [him] because [he] had uncovered their illegal activity." In support of his claim, appellant offers his own sworn affidavit, which includes proffers of expected testimony from other witnesses and references to supporting documentation. However, appellant—both personally and through appellate defense counsel—did not provide this court with affidavits from the witnesses whose testimony he proffered nor did he include any of the supporting documents he referenced in his affidavit. The sworn affidavits from the trial defense team dispute appellant's factual allegations. Ordinarily, this would present conflicting affidavits requiring a hearing under *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967). *United States v. Ginn*, 47 M.J. 236, 242-43 (C.A.A.F. 1997). Applying the first, second and fourth *Ginn* principles, however, we are convinced a post-trial evidentiary hearing is unwarranted. *See id.* at 248.

First, we disregard all "speculative or conclusory observations" in appellant's affidavit. *See id.* ("[I]f the affidavit does not set forth specific facts but consists instead of speculative or conclusory observations, the claim may be rejected on that basis."). Instead, we look only at those factual allegations in appellant's affidavit that he is competent to offer. For example, appellant proffers the testimony of several individuals and further claims his counsel failed to contact these potentially favorable witnesses. While appellant is competent to state as fact that he *relayed* these proffers to his counsel, appellant—without supporting affidavits or similar proof from each witness—can only speculate regarding the substance of their testimony and whether they were contacted by his counsel. *See, e.g., United States v. Loving*, 64 M.J. 132, 150-52 (C.A.A.F. 2006) (finding "a potentially meritorious claim of ineffective assistance of counsel arising from his trial defense counsel's failure to conduct a reasonable investigation" after the petitioner "filed voluminous unrebutted affidavits" and other "documentary evidence to support his assertion"). Without affidavits from potential witnesses stating they were not contacted by the defense team or similar evidence, we have no way to assess how appellant is competent to state as fact what his defense team did or failed to do while he was in pretrial confinement.

14

Second, we further disregard those portions of appellant's affidavit where "the appellate filings and the record as a whole 'compellingly demonstrate' the improbability of those facts . . . ." *Ginn*, 47 M.J. at 248. For example, appellant alleges SSG JJ "was ordered to destroy [him]" even though SSG [JJ] told appellant "how professional [appellant] was." Appellant claims his "defense team did not pursue this, and SSG JJ was not cross examined about this." However, SSG JJ was cross-examined at trial and testified appellant was a poor performer with a bad attitude.

Third, we also disregard the asserted facts in appellant's affidavit that, even if true, are irrelevant. *See id.* ("[I]f the facts alleged in the affidavit allege an error that would not result in relief even if any factual dispute were resolved in appellant's favor, the claim may be rejected on that basis."). For example, appellant cites his defense counsel's failure to obtain copies of unrelated complaints made to an inspector general's office and an unnamed congressional representative's office. Even if his speculation is correct, appellant would not be entitled to relief because his defense counsel failed to obtain an unrelated complaint protesting events "at the Special Warfare School" or requesting a transfer "out of Fort Stewart."

## 2. *Deficiency Analysis*

After stripping from appellant's affidavit all allegations that are speculative, conclusory, irrelevant, and compellingly contradicted by the record and appellate filings, what is left is a series of non-specific proffers appellant claims to have made to his defense counsel. Accepting as fact that appellant made each of these remaining proffers to his defense counsel, our task is to determine whether counsel exercised reasonable professional judgement in response to these proffers. This task does not involve picking which proffers counsel should have investigated or presented at trial. Instead, we focus on whether the investigation supporting counsel's pretrial preparation and trial performance strategy was itself reasonable. *See Wiggins v. Smith*, 539 U.S. 510, 522-23, 534-35 (2003) (limiting the scope of appellate review of counsel's pretrial preparation to the same reasonableness standard used in *Strickland* to assess counsel's trial performance).

In this case, we find the trial defense team completed sufficient pretrial investigation and analysis to justify our deference to their tactical and strategic decisions. Notwithstanding appellant's speculation about what his counsel failed to do, defense counsel's sworn affidavits recounting their pretrial efforts remain unrebutted by competent evidence. Among the clearest examples of the reasonableness of counsel's pretrial investigation is their treatment of appellant's self-defense claim. When appellant presented a self-defense theory that included an alleged conspiracy involving a secret organization within the unit known as the "black masons," defense counsel did not reflexively dismiss his account as fanciful or contrived. Instead, defense counsel, among other things, "interviewed nearly

15

every soldier in [appellant's] platoon. No one admitted they had heard of the 'black masons.'" After an exhaustive investigation, it was not unreasonable for the defense team to conclude they were spending "valuable time trying to corroborate a conspiracy that was simply not there."

Moreover, counsel had the expert assistance of a psychiatrist and forensic psychologist, among other experts, during their pretrial investigation. Both of these experts examined appellant and concluded he "suffered from 'Delusional Disorder' characterized by non-bizarre delusions based on paranoia that led to a 'perfect storm of events' on the night of the shootings." Importantly, this diagnosis did not lead counsel to disregard appellant's proffers without investigation. Instead, it helped explain why the majority of appellant's proffers could not be corroborated. Under these circumstances, defense counsel executed a trial strategy that placed appellant's diagnosis before the panel at trial. This was done in an apparent attempt to recast any perceived inaccuracies in appellant's testimony as the product of a disorder, not dishonesty. Without considering the outcome, we find this strategy was reasonable under the circumstances based on sufficient pretrial investigation. Accordingly, we conclude appellant has failed to meet his burden to show deficient performance or preparation by his trial defense team.

### 3. Prejudice Analysis

Even assuming deficient preparation or performance by counsel, it is important to again note the overwhelming evidence of appellant's guilt in this case. Appellant's murders of SSG DD and SGT WD were immediately detected. Appellant's murder of SSG DD was preceded and followed by incriminating statements (e.g., screaming, "I'm going to kill you" before firing his rifle, and "I did it so what" immediately afterwards). Eyewitnesses saw appellant continue his attack on SSG DD under circumstances precluding any colorable claim of self-defense (e.g., shooting him six times while he was running away from appellant before collapsing on the ground and pleading for appellant to stop). The physical evidence corroborated appellant's admissions and eyewitness testimony (e.g., ballistic evidence matched appellant's rifle to the gunshot wounds to SSG DD and SGT WD, and the twenty-seven spent cartridges recovered from the scene).

Even accepting as true appellant's speculative and uncorroborated account of a "black masons" conspiracy, none of his allegations help justify the use of deadly force on the night of the offenses. Conversely, many of appellant's assertions undercut his claim of self-defense. For example, appellant claims members of his unit retaliated against him for his knowledge of and refusal to participate in their illegal activity. However, appellant cites being placed "on KP duty[,]" his "TA 50 going missing, vandalism, personal property being stolen, and similar activities" as instances of "retribution" by members of his unit. What remains unexplained is how relatively low-level "retribution" on previous occasions would help appellant justify

his use of deadly force at the time of the offenses. Appellant does not argue, much less prove, he had a reasonable apprehension that death or grievous bodily harm arising from prior instances of KP duty or missing TA 50. Instead, the full weight of his self-defense claim depends on the events just prior to the shootings, and not on the collateral issues appellant cites as instances of deficient pretrial investigation. Accordingly, appellant's assertion that his defense counsel provided ineffective assistance lacks merit.

## CONCLUSION

On consideration of the entire record, the findings of guilty and the sentence are AFFIRMED.

Judge CELTNIEKS and Judge BURTON concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court